deeds and mortgages were recorded and indexed promiscuously, in the same volume.

All these considerations, and others which might be mentioned, as well as a proper regard to the rules of interpretation peculiarly applicable to the statutes under consideration, constrain us to regard the supplementary act of 1851, as merely *directory* to the recorder. The recording of the mortgage, therefore, by the language of the statute, and, we think, by its true spirit, gives to this recorded mortgage full effect and validity from and after the time of its delivery to the recorder for record.

The decree must be entered accordingly, for the plaintiff.

PECK, GHOLSON and BRINKERHOFF, JJ., concurred; SCOTT, J., dissented.

---

THE PORT CLINTON RAILROAD COMPANY *v.* THE CLEVELAND AND TOLEDO RAILROAD COMPANY.

THE TRUSTEES OF PORTLAND TOWNSHIP *v.* THE CLEVELAND AND TOLEDO RAILROAD COMPANY.

1. If, in any case, it would be competent for a court to decree the specific performance of a contract to operate a railroad, requiring, as it would, personal acts, involving the continuous exercise of skill and judgment under varying circumstances and emergencies, it could only be in a case where the demand for the exercise of such a power was stringent, and the circumstances such as to authorize the court in making an order to limit its duration as to time, and to define, to some proper and reasonable extent, the mode and manner in which it should be obeyed.

2. The P. C. Railroad Company leased its franchises and road for the term of ninety-nine years, renewable forever, to the C. & T. Railroad Company, which was a company created by the consolidation of the T. N. & C. Railroad Company and the Junction Railroad Company. The consideration was in the form of covenants—to pay taxes, to assume debts, to finish the road and to operate and manage the road in such a manner as would not forfeit or endanger the franchises and corporate rights of the lessor. It appeared that only a small sum of money had ever been paid in by the stockholders of the P. C. Company, which had never been expended; that the cost of any work on the road previous to the lease had been defrayed by the Junction Company, and that this

work had been done, and the organization of the P. C. Company made under the.general law of the state, to enable the Junction Company to extend its line in a manner its charter did not permit. Held, That the P. C. Company was not entitled to a specific performance of the covenant in the lease, to operate the road.

3. Where a township through which a railroad might be located, was by a statute "authorized to subscribe to the stock of said railroad :" Held, that while under such an authority, the contract of subscription might contain terms and conditions, affecting its subject matter, and the consideration to be paid and received, the making a subscription and paying money for stock, could not be made a consideration to sustain a contract giving the township a claim to control the general conduct and discretion of the directors of the railroad company, in matters involving the pecuniary interests of the company and its stockholders, to an amount far exceeding the subscription of the township. It was not the intention of the legislature to authorize the township to obtain by its contract such a claim, or the directors of the company for the time being so to limit the power and discretion of future boards of directors.

4. Where two railroad companies in their agreement for consolidation, inserted an article to provide for the completion and running of the route of one of the companies, and the directors of the consolidated company failed to comply with such provisions. Held, That if the duty thus created, was owing to all the stockholders, one of the stockholders could not sustain an action against the directors to enforce a compliance therewith; and, that if the duty was owing to a class of stockholders, having in respect to the matter an interest or right distinct from another class, any proceeding to obtain relief, for a refusal or neglect on the part of the directors to discharge the duty, must bring before the court not only the directors of the company, but the two classes of of stockholdors.

RESERVED in the district court of Ottawa county.

The case is sufficiently stated in the opinion of the court.

*T. W. Bartley, R. P. Spalding* and *L. S. & J. T. Beecher,* for plaintiffs.

*Hitchcock, Mason & Estep,* and *R. P. Ranney,* for defendant.

GHOLSON, J.—The Cleveland and Toledo Railroad Company is the product of a consolidation of the Toledo, Norwalk and Cleveland Railroad Company, and the Junction Railroad Company. This consolidation was effected on the 15th of July, 1853, by an agreement that day made, to take effect on the 1st of September, 1853. By the terms of the consolidation, the Toledo, Norwalk and Cleveland Company was to issue to its stockholders an amount of stock or bonds equal

to one half of the then amount of its capital stock, and with this addition, the aggregate stock of the two companies was to become the stock of the Cleveland and Toledo Railroad Company. It appears to have been the object of each of the original companies, or of their promoters, to construct a through line of railroad between the cities of Cleveland and Toledo, one of which would pass through Norwalk, and the other through Sandusky. It may be inferred that to avoid the effect of rival routes, under different management, was an inducement to the consolidation. But the construction and running of the two lines were contemplated; and to insure this being done on the northern route through Sandusky, the following article was inserted in the agreement of consolidation:

"The Cleveland and Toledo Railroad Company shall occupy and construct a line of railroad, extending from Sandusky, across Sandusky Bay, by. Port Clinton, Perrysburg and Maumee City, to or near Swanton, assuming the railroad of the Port Clinton Railroad Company, and connecting with the railroad of the Northern Indiana Railroad Company, at some convenient point near Swanton. It shall open and maintain a railroad connection between Sandusky and Toledo, upon the same guage with the road between Sandusky and Cleveland, to be finished simultaneously with the opening of the road to Perrysburg." It was also agreed, that "the Cleveland and Toledo Railroad Company will establish and maintain workshops, both at Norwalk and at Sandusky, sufficient for the ordinary repairs of machinery on the respective lines."

In carrying out the object of opening and maintaining a railroad connection between Sandusky and Toledo, the new company, having a constructed road from Cleveland to Sandusky, proceeded to obtain a lease from the Port Clinton Railroad Company, which was executed on the 28th of October, 1853. By this lease, the Port Clinton Railroad Company demised to the Cleveland and Toledo Railroad Company, for the term of ninety-nine years, renewable forever, the use and enjoyment of its road and franchises.

The consideration expressed in the form of covenants, was the payment of taxes, the assumption of debts, the finishing the road, and its operation and management in such manner as would not forfeit or endanger the franchises and corporate rights of the lessor, and the allowing the stockholders of the Port Clinton Railroad Company, on the payment of their subscriptions, to receive such dividends as the holders of a like amount of stock in the Cleveland and Toledo Company would be entitled to receive.

The Cleveland and Toledo Company thereupon proceeded to finish the projected road of the Port Clinton Company, and did, for several years, run a through line from Cleveland to Toledo, by way of Sandusky, as contemplated by the agreement of consolidation. Subsequently, in the year 1858, the directors of the Cleveland and Toledo Company ceased running a through line from Cleveland to Toledo, by way of Sandusky, and after, for a short time, running a train from Sandusky to Port Clinton, discontinued the use of the road constructed under the lease from the Port Clinton Company. From that time to the present, no trains have been run on that road; the rolling stock and other personal property connected with the use of the road have been removed; and no repairs of the road have been made.

The object of the petition filed by the Port Clinton Railroad Company is to obtain a specific performance of the covenant, on the part of the Cleveland and Toledo Railroad Company, as to the road finished under the lease, to "operate and manage the same in such a manner as will not forfeit or endanger the franchises and corporate rights" of the Port Clinton Company.

The origin of the Port Clinton Company, its condition at the time of the lease, and its position at the time of the institution of the action, are shown by the testimony. It appears that the Junction Railroad Company sought to extend its road west from Sandusky, across Sandusky Bay, by way of Port Clinton, to Toledo. In this attempt, rights of way had been obtained, and a considerable sum of money expended in constructing the road, when further progress

was arrested by an injunction obtained on the ground of a want of power under its charter. Pending those proceedings, and under an apprehension of their unfavorable termination, a company was organized, under the general law of the state, by persons interested in the Junction Company, to carry out the project. The capital stock of the company thus organized, under the name of the Port Clinton Railroad Company, was $100,000, of which amount $11,000 were subscribed, and of this only five per cent., which was necessary to perfect the organization, has ever been paid. It does not appear that even this small sum has ever been expended in the prosecution of the object of the organization; but, on the contrary, that all means expended, up to the time of the execution of the lease, were furnished by the Junction Railroad Company. The evidence shows that, from the execution of the lease in 1853 until 1858, there was no meeting of the directors or stockholders of the Port Clinton Company. Its first corporate action, after the execution of the lease, appears to have been had with a view to the bringing of the present suit.

The relief sought in the action of the trustees of Portland township, which includes within its limits the city of Sandusky, is substantially the same as that in the action of the Port Clinton Company. The position which, it is claimed, authorizes a demand for such relief, is maintained upon the following circumstances: The Junction Railroad Company was authorized to receive, and the counties and townships through which it might be located were authorized to make, subscriptions to its capital stock. In pursuance of this authority, the trustees of Portland township subscribed stock to the amount of one hundred and fifty thousand dollars, which was paid in the bonds of the township. Of the stock thus subscribed, the trustees of the township still hold about eleven thousand dollars, and are to that extent stockholders in the Cleveland and Toledo Railroad Company. The subscription of stock was under certain conditions. The substance of those of which any notice need be taken, is that

fifty thousand dollars of the amount subscribed should be expended at or east of Sandusky, and one hundred thousand west. The route west was to cross the Sandusky Bay. It was provided that upon a failure of the Junction Company to perform the conditions, or any substantial part thereof, the subscription was to become void, at the option of the trustees; and, on the surrender of the stock, the bonds, or their proceeds, were to be returned. It is stated, and the evidence sufficiently shows, that a main inducement of the subscription was the benefit which would accrue to the city of Sandusky, by a direct line of railroad communication, east and west. It was certainly with this view that the covenants above stated were inserted in the contract of subscription. To insure the attainment of that object, the articles before referred to were inserted in the agreement of consolidation. And the evidence shows that the prosperity of Sandusky city, and the pecuniary interests of its citizens, have been injuriously affected by the discontinuance, on the part of the Cleveland and Toledo Company, of its northern route, as a line of communication between Cleveland and Toledo.

The rights of the plaintiffs, in the two actions, depend upon some general considerations, applicable to both, and to these our attention will be first directed.

The specific performance of a contract rests on the ground that the ordinary remedy for its breach will not afford adequate relief. In some cases, this is so apparent that a specific performance is decreed as a matter of course. Such is the case of a contract for the conveyance of real estate. In such a case, if the party has not, by some act or omission, precluded himself from relief, he may be said to be entitled to it as a right. For although the court is said to have a discretion in granting or refusing a specific performance, it is not an arbitrary discretion, but a discretion to be regulated by precedent and established practice. It would, however, be going too far to say that, in all cases where the ordinary legal remedy would not afford adequate relief, there is neces-

sarily a right to specific performance. In the case of a contract for personal service, it may be that, on a refusal to perform the contract, an action for damages would not afford adequate relief, and yet it is clear that a court of equity will not attempt to enforce specifically such a contract. *Hamblin* v. *Dinneford*, 2 Edwards, 529; *De Rinafinoli* v. *Rossetti*, 4 Paige, 264; *Ex parte Clark*, 1 Blackf. 122; *Stocker* v. *Brockelbank*, 5 Eng. L. & E. 67; 3 Mac. & G. 250.

There are cases in which a court will control the personal conduct of a party by an injunction, and thus indirectly compel him to render a personal service, or to do some personal act. This is where there is a contract to render personal service for one person or to do a personal act for the benefit of one person, and at the same time a contract not to do some act which would defeat the object intended by the parties. The cases in England on this subject are fully examined in *Lumley* v. *Wagner*, 13 Eng. L. & E. 257, 1 De Gex, Mac. & G., 604. In that case the defendant had contracted to sing at the theatre of the plaintiff for a specified time, and *not to sing* at any other theater during the same period. In violation of her contract she made an engagement at another theater, and was enjoined from its fulfillment. The bill did not seek, and any power was disclaimed, to compel performance of the contract to sing, but the negative covenant, it was held, might be inforced by an injunction. This was contrary to the decision of the vice chancellor in the cases of *Kemble* v. *Kean*, 6 Sim. 333, and *Kimberly* v. *Jennings*, 6 Sim. 340, which were overruled. "Beyond all doubt," said the chancellor, "this court could not interfere to enforce the specific performance of the whole of this contract. * * * It is true that I have not the means of compelling her to sing, but she has no cause of complaint if I compel her to abstain from the commission of an act which she has bound herself not to do, and thus possibly cause her to fulfill her engagement." While saying, however, that the injunction might tend to the fulfillment of her engagement, he added, "that, in continuing the injunction, I disclaim doing indirectly what I can not do directly."

A reference to some of the cases, which the research of the chancellor in one of the cases just cited has made easy, will enable us to see what is the character of the personal acts, the doing of which, it has been admitted, there is no power to enforce. The case of *Clark* v. *Price*, 2 I. Wilson, C. C. 157, was an agreement on the part of Price to take notes in the court of exchequer, and compose reports for the plaintiff. In the case of *Hills* v. *Croll*, 2 Phill. 59, 1 De Gex, Mac. & G. 627, note, Croll had obtained two patents for the manufacture of ammonia. Hills was to supply the acids used in the manufacture, and Croll was to purchase acids from no other person. Hills was to have the right to purchase all the ammonia produced at a certain price. In the case of *Hooper* v. *Brodrick*, 11 Simons, 47, the defendant was the lessee of an inn. The lease contained a covenant "to use and keep open the demised premises during the term as an inn, * * * and not to do, or cause to be done, any act whereby (licenses) might become forfeited or be refused." It was argued by counsel that, "although the court can not compel the tenant of a house to carry on any particular trade or business in it, it may prevent him from using the house for any other business." The vice chancellor said: "The court ought not to have restrained the defendant from discontinuing to use and keep open the demised premises as an inn, which is the same, in effect, as ordering him to carry on the business of an innkeeper; but it might have restrained him from doing, or causing, or permitting to be done, any act which would have put it out of his power, or the power of any other person, to carry on that business on the premises."

It is said in Story on Equity Jurisprudence, section 725, that, as to contracts for personal acts and proceedings, there is some diversity of judgment in the authorities as to the cases and circumstances in which a specific performance ought to be decreed in equity. And, certainly, it is difficult to deduce from the authorities any principle which will guide in the determination of particular cases. The case of *Kemble* v. *Kean*, 6 Simons, 333, shows the ground of the difficulty felt by the vice chancellor in enforcing the performance of a

personal act, and his remark on that point, though he was held to have erred in refusing to enforce the negative covenant, is entitled to weight. The agreement, he said, "is mainly and substantially of an active nature, and is so undetermined that it is impossible to have performance of it in this court." That which was to be done required continuous personal action. Such action would constitute the peformance to be decreed, and if decreed an obligation on the part of the court would result, to see that the performance was within the intent of the contract. It is different from the case, where the act to be done would produce .some tangible result, which could be inspected and compared with the requisitions of the contract. When no such result follows the personal act, but the act involves the continuous exercise of skill, judgment or discretion, the manner and mode of which are, from its very nature, undetermined, the difficulty of a specific performance seems almost insuperable.

Even in cases where there would be a visible and tangible product from the personal act, if the contract does not define and determine the character of that product, the court will not supply that which has been left by the parties as a matter of individual judgment, taste or discretion. Thus, in a class of cases in which there has been a diversity of opinion as to the propriety of a specific performance, the building a house on particular land, the covenant to build must have a definite certainty as to size, materials, etc. Story Eq. Jur., sections 725–727. In the case of *Storer* v. *Great Western Railway,* 2 Younge & Coll. 48, it was said: "It is competent to this court to interfere to enforce the specific performance of a contract by a defendant to do defined work upon his property, in the performance of which the plaintiff has a material interest, and which is not capable of adequate compensation in damages. * * * * * The court has to order the thing to be done, and then it is a question capable of solution whether the order has been obeyed." In the case of *Stuyvesant* v. *Mayor, etc., of New York,* 11 Paige, 414, decided on the authority of the one above cited, the improvements to be made were specifically described. The case of *The South*

*Wales Railway Co.* v. *Wythes*, 31 E. L. & E. 226, was one where the contract required the company to find land for stations and build stations within a reasonable time, and the defendants were to execute the works for a double line of railway according to the terms of the specifications to be prepared by the engineer for the time being of the company, and to give bond for £50,000 to secure the performance of their contract. The bill of the company to enforce a specific performance was dismissed. It was remarked by one of the lords justices, " I do not say that this court will not execute an informal agreement when it can itself supply the deficient terms, but it will not do so if those terms are to be supplied *aliunde*. Who is here to say in what mode the stipulations as to 'finding the land,' and 'building the stations,' are to be carried into effect? Clearly, this was to be done under the direction of the engineer for the time being, who might direct something unreasonable." A like remark was made by the other justice as to executing the works according to specifications to be prepared by the engineer of the company. There are other cases in which the objection of indefiniteness and uncertainty has been held fatal to the claim for specific performance. *Taylor* v. *Partington*, 7 De Gex, Mac. & G. 328.

We have been referred, in the argument, to the case of an agreement to form a partnership, as a personal act, the performance of which will be enforced. A reference to the cases, and to the comments on them, in the elementary books, will show the object and the limited extent of the exercise of jurisdiction in such a case. Collyer on Partnership, secs. 202, 203; Story on Partnership, secs. 188, 189. The object is to invest the party with the legal rights resulting from signing the partnership articles, or creating the relation of partnership. The jurisdiction does not extend to the carrying on the partnership thus established—to the specific execution of the partnership articles or agreement. Those who have agreed to become partners can stand in no better position, in this respect than those acting under a partnership agreement. Indeed, the refusal, by courts, to enforce the performance, by

partners, of acts required by their agreement, illustrates the difficulty of a specific performance of personal acts of the character above described—such acts as require the continu ous exercise of skill and judgment, good faith and diligence, the results of which can frequently be traced only in their general tendency or effect.

Speaking of the duties and obligations of partners, it is said by Story, in his work on Partnership, sec. 224 : " In respect to such duties and obligations as are of a positive and personal nature, it seems difficult to perceive how courts of equity can enforce a specific performance of them ; and, threfore, in case of a breach thereof, the injured party must be left to his remedy, if any, at law. But the same objection does not seem to apply to cases where the relief sought is to enforce the due observance of negative duties, and obligations; for here, all that is required is, that the court should restrain the partner from violating them ; or, in other words, from doing acts which violate the express or implied obligation which he is under to forbear."

In the case of *Waters* v. *Taylor*, 12 Ves. 10–25, the parties interested in the Italian opera, of London, were bound by a deed which purported to regulate the management of the opera. The parties disagreed, and an application was made to the lord chancellor, and, in his opinion, he said: " Upon this deed, if it stood alone, the question would be, what a court of equity is to do with it ? It is compared to the cases of partnerships, West-India estates, and other cases, in which this court puts in a middle man ; and a notion seems to be conceived that this court is to be employed in carrying on any concern. In the instance of a partnership, if the partners, each excluding the other, that state of circumstances, operating as a dissolution, puts an end to the partnership ; and then this court interposes in this way, that it will wind up the concern, and, with that view, will appoint a person to collect and manage, until an end can actually be put to the concern. So, a manager of West-India estate is appointed, not for the purpose of carrying it on, but to enable the court to give relief when the cause shall be heard. The same principle, however, upon

which a covenant is inserted that this concern shall proceed for forty-two years, and, if the parties can not agree, the Lord Chancellor is to appoint a manager, will justify an expectation that this court is to carry on every brewery and every speculation in the kingdom. Such a covenant will not induce the court to act." The parties, seeing the difficulty of a management under the deed, desired the court to appoint a manager, having " not the powers prescribed by the deed, but such powers as this court shall think fit." The chancellor said : " If these two parties only were interested, and, representing that they could not carry on the concern, desired a sale, this court would, for the purpose of regulation in the intermediate time, with a view to the relief ultimately to be given, appoint a person to manage : but this application is made upon a deed, under which it is absolutely impossible that this concern can proceed, desiring that, during these reversionary terms, this court shall be the manager, which may, with equal reason, be desired in every brewery, and all the joint concerns in the kingdom. * * * Upon the whole, it is quite impossible that this court can appoint a manager, with such powers as the court thinks proper." And so, the court, as a mode of final relief, refused to appoint a manager under the deed, or to become itself the manager of the opera.

In accordance with these views, it was said, in *Coe v. Col. P. & I. Railroad Co.*, 12 Ohio St. Rep. 372–380, that : " A court of equity, as a temporary measure, during the pendency of a litigation, for the preservation of property, and to prevent its waste and destruction, might undertake, by means of a receiver," the business of operating a railroad. " But that, as an ordinary measure of relief, for an indefinite period, and for the purpose of earning money, the business of operating a railroad may be undertaken by a court of justice, is a proposition which, we think, can not be maintained. It would, we think, be a departure from the proper and ordinary functions of a court of justice, and be attended with intolerable mischief and inconvenience."

Now, in what consists the difference between the management of a railroad by the court itself, through an officer, and

an enforced management by parties under a contract? If the contract was not specific, and it is difficult to conceive how a contract could be drawn which would provide for all the emergencies in the management of such a business, this alone, according to cases above cited, and particularly the views of Lord Eldon, from which some extracts have been given, would constitute a very forcible objection. Even if the contract were sufficiently specific, so that the party, when ordered to operate the railroad, would know the manner and mode in which the order was to be obeyed, still the question of obedience to the order must necessarily be left open. And the question of obedience to such an order might come up for solution, not once, as in the case of the archway, the erection of which was ordered in *Storer* v. *Great Western Railway*, but in instances innumerable, and for an indefinite time. Instead of the final order being the end of litigation, it would be its fruitful and continuous source, and that, too, of litigation not in the regular course of judicial proceedings, but irregularly, on a summary application. And such application to be made by either party, one when he conceived there had not been a faithful compliance with the order, and the other when exemption from some provision might be claimed, on the ground of inability or unforseen events. For though the law might give damages for the breach of the contract, a court of equity will not enforce it, if, from circumstances, such enforcement becomes unreasonably harsh and oppressive, and without any corresponding advantage to the party seeking performance. And if a court should undertake to enforce a contract, requiring continuous personal action, and running through an indefinite period of time, it must necessarily reserve the power to relieve against any unjust, harsh or oppressive operation of its order, shown by circumstances unforeseen, and occurring, it may be, years after the order was made.

There is another consideration connected with such an order. Its enforcement does not merely concern the parties to the contract, but the public. The railroad operated would be for public use, and a duty would devolve on the court to see that the contract for its operation was such as would carry into effect

the intent in the grant of the franchise, and that the order for its operation was complied with in the same view. If the court undertakes to enforce the operation of a railroad, it must surely be so enforced that the persons and property of citizens shall be safely and securely carried. An inquiry is here suggested, which will be the subject of comment in another connection, whether, when the charter contemplates that the management of a railroad shall be by a board of directors, elected annually by stockholders, it would be proper to supersede the personal discretion of all successive boards of directors, by a contract, and an order for its enforcement, of continuous and indefinite duration.

We have examined the cases cited by counsel, as having a bearing on the question, under consideration. Of the cases of *The State* v. *Hartford and New Haven R. R. Co.*, 29 Conn. 538, and *Rugby* v. *The Great Western Railway*, 2 Phill. 44, neither involved the operation of a railroad. In the first, the company having a road constructed to a point at tide water, in New Haven harbor, and running to that point for a time with its passenger and freight trains, discontinued the running, to that point, of its passenger trains, diverging on a track constructed a short distance from the point, was compelled by a mandamus to run passenger trains as before, and as required by its charter. In the other, an injunction was asked to compel the company, bound so to do by contract, to stop such passenger trains as it might run, at a particular station. The jurisdiction was sustained, so far as to order an account. In the case of *The People* v. *The Albany and Vermont Railroad Co.*, 24 N. Y. R. 261, it was held, that where a railroad corporation has completed its road, and abandons or ceases to operate a part of the route, the remedy is not an action in equity in behalf of the public. It was not a case of contract, nor was the question, whether, by mandamus, the operation of the road could be enforced, discussed.

We do not see that these cases furnish a guide for our decision, and we are compelled to rely on the general principles, which have been examined at length, for which the importance of the question, and of the cases must be an apology.

And, we think, enough has been said to show that the propriety of the exercise of the power to enforce specific performance, in cases like the present, is exceedingly questionable, and would require extreme care and delicacy in its application. If permissible at all, the demand for the exercise of the power should be stringent, and the circumstances of the case so peculiar, as to authorize some limit to the extent and operation of any orders which might be made.

We have now to consider the peculiar features of the two cases under consideration. We do not think the Port Clinton Company can be regarded as representing any interest, except its own corporate rights. It was no party to the contract of consolidation, and must stand on the covenant in its lease. That covenant required the Cleveland and Toledo Company to operate and manage the road described in the lease, "in such a manner as will not forfeit or endanger the franchises and corporate rights" of the Port Clinton Company. The only proper object which the Port Clinton Company can have, in asking our interposition, is the protection of its franchises and corporate rights." These franchises and corporate rights it leased perpetually, reserving to itself no pecuniary consideration in the shape of rent, or otherwise, except in the payment of debts it might owe (of the nonpayment of which there is no complaint), and no advantage to its stockholders, except the privilege, on the payment of ninety-five cents on the dollar of the amount of their subscription, to receive the same dividends as the holders of a like amount of stock in the Cleveland and Toledo Company. We do not see that the Port Clinton Company, at the time of the lease, regarded itself or its stockholders as holding anything of pecuniary value, in rights or franchises, or in work constructed on the road, for really no consideration, moving to itself or its stockholders, was exacted. We can not shut our eyes to the fact, transparent in the testimony, that the Port Clinton Company itself, and the operations in its name, were a device and means used by the Junction Company, to accomplish that object, which, under its own charter it had no power to attain—a direct route to Toledo. Look

ing behind the forms of the transactions, and this, as a court of equity, asked for extraordinary relief, we have a right to do, the rights and franchises, and any property ostensibly in the name of the Port Clinton Company, except the small amount of percentage paid by the stockholders, really belonged to the Junction Company, and were so treated in making the consolidation. Under the arrangement then made, the Port Clinton Company may still exist as a legal entity, but we do not think it has any such standing in court, or any such interests to be protected, as will support its claim for relief.

The trustees of Portland township rely upon a contract for subscription of stock, between them and the Junction Railroad Company, to the rights and obligations under which contract, the Cleveland and Toledo Railroad Company succeeded. This contract was made under the authority of an act of the legislature, passed January 22, 1851, providing, "That the counties, townships, cities and incorporated towns through which said railroad may be located, are hereby authorized to subscribe to the stock of said railroad, in the manner and on the conditions hereinafter prescribed." The subsequent provisions have no reference to the terms of any contract of subscription which might be made, but to the amount to be subscribed—the preliminary steps to invest the proper authorities with the power to subscribe, and the payment of the subscription. The contract of subscription, and the force and effect of any terms it might contain, are to be determined upon the extent and meaning of the language—" authorized to subscribe to the stock of said railroad." Now, this contract was to be made between two bodies, acting under limited powers. The subject matter of the contract was a subscription of stock. The consideration to be paid by a township would be the price of certain shares of stock—that to be furnished by the railroad company, the certificates of stock, including the right to vote as a stockholder and receive dividends. We are not prepared to say that in such a dealing between a township and a railroad company, acting through their proper officers, there may not be terms and conditions—

that the transaction must necessarily be confined to the simple payment of money, or giving securities for its payment, on the one hand, and the delivery of certificates of stock on the other. But we think that such terms and conditions can not properly extend beyond the subject matter and the consideration.

It might be competent for the parties to provide, as is done in this case, that on the breach of any condition looking to the benefit of the township in the construction or operation of the road, the contract should be canceled. So an obligation might, perhaps, be imposed as to the expenditure of money in a particular locality, to be enforced as a trust by an injunction against its expenditure elsewhere, or as a condition involving its return if not used as stipulated. Conditions of this description only affect the subject matter of the contract and its consideration—the money paid and the stock received. But the question becomes entirely different, when the making a subscription and paying money for stock, is relied on as a consideration to sustain a contract, giving the township a claim to control the general conduct and discretion of the directors of the railroad company, in matters involving the pecuniary interests of the company and its stockholders, to an amount far exceeding the subscription of the township. We do not think it was the intention of the legislature to authorize the township to obtain by its contract such a claim, or the directors of the company for the time being, so to limit the power and discretion of future boards of directors.

The trustees of Portland township also occupy the position of stockholders. They were such in the Junction Company, and by the consolidation became such in the Cleveland and Toledo Company. The inquiry, therefore, as to their right as stockholders to enforce the agreement of consolidation, may be supposed to arise. If the agreement of consolidation imposed a duty on the directors of the Cleveland and Toledo Company to carry into effect its provisions, this duty, like that to pursue the provisions of the charter, might be owing to all the stockholders. If so, then

a suit by one or more of the stockholders in behalf of them selves and the others, might be sustained to restrain acts on the part of the directors *extra vires,* or involving a fraudulent breach of trust. But we know of no case of such a suit to enforce an active duty within the power of the directors. "If a court of equity were to assume jurisdiction in such a case, could it do so without opening its doors to all parties interested in corporations, or joint stock companies, or private partnerships, who, although a small minority of the body to which they belong, may wish to interfere with the conduct of the majority? This can not be done; and the attempt to introduce such a remedy, ought to be checked, for the benefit of the community." *Lord* v. *The Copper Miners' Co.,* 1 Hall & Twells, 85–99. In the case of stockholders in one of our railroad companies, the remedy must be sought in the election of a new board of directors.

There may be cases, however, where there were classes of stockholders, and a duty may be owing to one class. This might occur where there is preferred stock, and it might possibly happen, that in the consolidation of two companies, the stockholders of one might, as a class, acquire rights distinct from the stockholders of the other. Whether this occurred in the present case—whether the stockholders of the Junction Company, as a class, acquired distinct rights, and can upon those rights found a claim for performance of any stipulation intended for their benefit, or, failing in that, for a rescission and a restitution to their original status, we need not decide. The action of the trustees of Portland township does not proceed on such claim, and we have not the parties before us, directly interested in its adjudication. Not only the class claiming distinct rights and the directors of the company, but the other class should be represented, and the difficulty of making them defendants on account of their number, which was suggested in an English case, appears to be obviated by our code. Section 37. *Mozley* v. *Alston,* 1 Phill. 790, 799.

Our attention was directed during the argument to a provision in the statute, authorizing the consolidation of these

37

companies, passed January 20, 1850, conferring jurisdiction on the supreme court, to enforce, by decree, " any agreement of consolidation, or for leasing, or for other accommodations " made between the companies.　A like provision is found in the general act of March 3, 1851, 1 S. & C. 275, note. Waiving the inquiry, whether there is now any court succeeding the supreme court intended by those acts, capable of receiving such a grant of original jurisdiction, we do not suppose it was the intention of the legislature to authorize or require an exercise of jurisdiction, not before recognized according to the principles of equity and the practice of courts, or which those principles and that practice would not properly permit.　Indeed, we do not understand that this is claimed by counsel.

We feel that we do not err in supposing that the two cases before us are really the presentation of the claim of those interested in the city of Sandusky, and its vicinity, to compel a compliance with provisions in the agreement of consolidation intended for their benefit, and which they had a right to expect would be carried out in good faith by the directors of the consolidated company.　Their claim commends itself to our sense of justice; and if they have been disappointed in their expectation, from a mere desire for greater profits or dividends, they have just ground for complaint.　We have given the claim, in the mode in which it is presented, a careful consideration, but acting as a court in a defined course and according to established principles, we feel bound to come to the conclusion that we can afford no relief.

We have carefully abstained from expressing any opinion, on questions presented in argument, as to the powers of railroad companies, under their charters or the general law, and particularly as to the extent of the power of a railroad company to lease its road, or make a connection with another railroad.　These questions are important, and may arise in cases where the decision will depend entirely upon their solution.

In each of the cases there will be a judgment for the defendant.

SUTLIFF, C.J., and PECK, BRINKERHOFF and SCOTT, JJ., concurred.