(Franklin Co., Court of Common Pleas.)

THE GREAT SOUTHERN FIRE-PROOF HOTEL COMPANY VS. W. J. McCLAIN.

---

1. Questions for consideration on application for an injunction stated.

2. Generally, a court of equity will not enjoin one of the parties to a building contract from violating it, since it would be, in effect, a negative enforcement of the contract.

3. Generally, a court of equity will not decree the specific execution of a building contract, because its performance would involve "skill, personal labor and cultivated judgment."

4. A court of equity will not enjoin, temporarily, the enforcement of an award of arbitrators, unless the complaining party, by his evidence, has raised a fair question, whether the award is not vitiated by fraud in the arbitrators, or in the arbitration.

---

STATEMENT.

The plaintiff and defendant entered into a written contract by which the latter agreed to construct a hotel building. It was stipulated that if the defendant should

fail to make such progress with the construction of the building, or use such diligence, as the superintendent of the plaintiff might deem necessary, all questions between the parties about the work, and all disputes between them should be submitted to arbitrators, and if their award was adverse to the defendant, the defendant should forfeit the right to complete the building, and the plaintiff should be entitled to take possession and finish it at the cost of the defendant.

The defendant stopped his construction of the building, because the plaintiff refused to allow his bill of $65,000 for extra work and materials.

The questions, 1. whether he should be allowed and paid the bill, and 2. whether he should proceed with the construction of the building, were submitted to arbitrators chosen as the contract provided. The award of the arbitrators was adverse to the defendant on both questions. The defendant refused to abide by the award.

Thereupon, in conformity to the contract, the plaintiff took possession, or attempted to take possession, for the purpose of completing the building. That action moved the defendant to ask for an injunction. Preceding that movement, the plaintiff asked for an injunction to restrain the defendant from interfering with the plaintiff's possession of, and work on the building.

---

PUGH, J.

Both parties have moved the Court to award them preliminary injunctions. Each wants the other restrained from interfering with its or his possession of the Great Southern Hotel building, and from doing anything towards constructing it. Each had obtained restraining orders to that effect, which, being awarded without notice. were to run only till these motions could be heard and decided.

In granting such injunctions as are prayed for, the questions made in the case as to the rights of the parties are not necessarily determined; if they are granted, they conclude no rights; the object is to preserve the property in controversy in statu quo, and to keep the parties in statu quo, till the questions about their rights can be determined. In awarding such injunctions, the Court or judge often does so without expressing, and often, too, without having the means of forming, any opinion as to the rights of the parties. Those rights are rarely ever determined before the final hearing of the case.

But this is one of the rare cases. A peck of affidavits and depositions were taken and filed. All of the questions made, save one, possibly, have been about as effectually put in evidence as they could be on final hearing. But the opinions which may be expressed on some of these questions by me are not to be understood as embarrassing or concluding the Court which may finally hear the case.

Upon such motions as these, if it is perceived that there is no real question to be decided, there will no interference. But, if there is a substantial question to be passed upon, a temporary injunction may be issued to preserve the property and restrain the belligerency of the parties, until the controverted questions can be regularly disposed of.

The action of the Court or Judge is swayed, in part by the fact that the injury to one side arising from the refusal of the injunction is certain, while the damage to the other, if it is issued, is, if any, inconsiderable.

All the equities will be considered, and the injury which would be done to the defendant by granting it, will be compared with the injury which would result to the plaintiff from withholding it. Lynch v. Union Institution, 159 Mass., 306. Camberland Tel. Co. v. U. S. Electric Co. 42 Fed. Rep., 273.

Where such motions are considered, two questions are determined: 1. Not that the petitioner has actually a right, but that he has a fair question to raise as to the existence of such a right. 2. Whether ad interim interference, by injunction, upon a balance of convenience or inconvenience to one party and the other is, or is not, expedient. Bearing these rules in mind these motions and their supports, will be discussed as briefly as possible, and in doing this the order of the motions as they are made in time, will be inverted, that of the defendant being considered and disposed of first.

His motion, viewed from his own standpoint, is virtually a motion to have the plaintiff restrained, for the time being, from breaking the building contract which was concluded between them. Specific enforcement of a contract is substantially a mandate. An injunction restraining a specific wrong is, in effect, negative enforcement of that contract.

"The jurisdiction of equity to grant such an injunction is substantially coincident with its jurisdiction to compel specific performance." 3 Pomeroy's Eq. Juris. Sec. 1341.

When a contract contains negative stipulations or covenants, that certain acts shall not be done, or when a contract's affirmative provisions imply such negative stipulations or covenants, a court of equity will restrain its breach by injunction; because it is one which will be "affirmatively specifically enforced." Negative covenants in leases, such as covenants not to erect buildings of a certain class, or not to carry on a particular trade, are illustrations. English courts of equity will enjoin the violation of some contracts, though they cannot be specifically enforced. But, with very few exceptions, American courts of equity have declined to adopt this doctrine. 3 Pomeroy's Equity Juris. Sec. 1341(n. 1.)

Our Supreme Court has declined to adopt the English doctrine, and is in harmony with a majority of the American courts, a proposition which is illustrated by the cases of Steinau. The Gas Company, 48 Ohio St. 324, and Port Clinton R. R. Co., Clev. and Tol. R. R. Co. 13 Ohio St., 544.

McClain's side of this case, as he has presented it, locates it in that category of cases. The building contract is one which cannot be "affirmatively specifically enforced" in equity. A contract must be mutual, or equity will not enforce it. Bourget v. Moniver, 58 Mich. 563; Glass v. Rowe, 103 Mo. 513.

By "mutual" is meant a contract which each party has a right to enforce against the other.

If the remedy, said our Supreme Court, is not mutual, only one party being bound by the contract, specific performance will not be granted. Hutchison vs. McNutt, 1 Ohio, 14.

How could a court of equity require McClain to specifically execute the contract? It seems to me there is only one possible answer to this question.

The language of the opinion in an analogous case (Port Clinton R. R. Co. v. Cleveland & Toledo R. R. Co., 13 Ohio St., page 556) is just as appropriate here as there. "Even if the contract were sufficiently specific, so that the party, when ordered to operate the railroad, would know the manner and mode in which the order was to be obeyed, still the question of obedience to the order must necessarily be left open. And the question of obedience to such an order might come up for solution, not once * * * but in instances innumerable, and for an indefinite time. Instead of the final order being the end of litigation, it would be its fruitful and continuous source, and that, too, of litigation not in the regular course of judicial proceedings, but irregularly, on a summary application." So here, in this case, the matter could not be disposed of by a decree capable of being enforced at once. The performance of the contract would involve "skill, personal labor and cultivated judgment." The decree would have to order McClain to perform a continuous duty running through several months. The question of obedience to it would be left open, and it would come up for solution more than once, from time to time, for an indefinite period.

In Ross v. The Union Pacific Ry. Co., 1 Wolworth 43, Justice Miller declared "th to establish the general doctrine that contracts for building may be specifically enforced in equity, would be to invite into litigation, very many matters which are now generally settled by the parties on a basis much more beneficial to the parties; and that it would require the constant supervision of the court, through its officers, in the conduct of affairs it is very poorly adapted to administer. The result of drawing to itself such a jurisdiction would certainly be far less remedial than the ordinary action for damages."

There being no power to compel McClain to specifically execute the contract, it is not, for this reason, one which a Court of Equity

could specifically enforce either by an affirmative decree, or negatively by an injunction, restraining its breach by the plaintiff.

Contracts to build or to repair will not, as a general rule, be enforced in equity. Fry on Specific Performance, American Edition, Section 76, and cases cited. Rayner v. Stone, 2, 128, 130 (n.) Paxton v. Newton, 2 S. M. G., 437. Flint v. Bradon, 8 Ves. 159. Brace v. Wehnert, 25 Beav., 378. In his work on "Buildings" Mr. Lloyd says that the cases in which equity specifically enforces building contracts are "noteworthy" exceptions, and that 'Courts of Equity will rarely order specific performance of building contracts." (Section 45.)

"'The Court considers,"he says,"whether an enforcement of a contract is practicable, and can be judicially carried out, realizing that specific performance of many building contracts would be undertaking to enforce exact fulfillment of agreements hampered by almost insurmountable difficulties in the complicated operations of builders, architects, contractors, sub-contractors and others."

I have dwelt on this point as I have, because the defendant virtually asks the court to have the plaintiff specifically carry out the contract; and I repeat that an injunction against the breach of a contract is, in effect, a negative enforcement of it.

In the contract in question in this case, there is a provision, that, in certain contingencies, and after an adverse decision by the arbitrators, McClain should forfeit all right to complete the contract, and that the plaintiffs shall be authorized to take possession and finish the building.

In discussing contracts of this type, the author before quoted (Lloyd) says: "The builder will be compensated in damages if the land owner wrongfully takes possession of the building. Specific performance cannot be compelled in such cases, nor injunction granted; but if the builder refuses to complete the work, and prevents the owner from doing the same, an injunction may, in certain cases, be allowed against him."(Section 65, last paragraph.)

This same question was fully and carefully considered in relation to a contract for building a railroad, in the case of Ross v. Union Pacific Ry. Co., 1 Wood. C. C.,26, in which nearly all of the authorities up to that time were reviewed. The decision was that the court could not enter upon the duty of compelling one party to build a railroad, and the other to pay for it according to contract.

The Corporation v. Rooney, 7 L. R. 8 Ch. Div. 191, cited by counsel for plaintiff, is so rich in instruction that I shall quote copiously from it. First it was said that upon an application just like this the "Court should take into account the balance of convenience; and if, on the one hand, irreparable injury may be caused by withholding the injunction, while, on the other hand, any injury occasioned by the injunction can be compensated by damages, the court will grant the injunction.

Rooney contracted with the town of Cork to build a bridge. Just as McClain was to do his work under the supervision and subject to the orders of a superintendent, so Rooney was to do his work under the direction of an engineer. There was a stipulation in the contract, just exactly like Section 9 of McClain's contract, which provided: "If the contractor shall at any time, in the opinion of the engineer fail to use such diligence, or to make such progress with the works as the engineer shall deem sufficient to ensure their completion within the time hereafter specified, then, it shall be lawful for the corporation * * *, after giving seven days notice thereof in writing, signed by the town clerk, and delivered to the contractor * * * to proceed with, and complete the works at the contractor's expense, either by employing workmen and purchasing material under the superintendence of their own officers, or by making a new contract, etc., * * *."

The only difference between that and section 9 of McClain's contract is that an award of aribtrators had to precede the right of the plaintiff here to take possession. But it is not a difference in principle or reason. In the contract between the town of Cork and Rooney there was a clause for arbitration of all disputes and differences which provided that the decisions of the arbitrators should be final.

The engineer complaining to the corporation that Rooney was making small progress with the work, the notice that the company would take possession and finish the work was served upon Rooney, but he refused to surrender, just as McClain says he does here. The corporation asked for an injunction, just as the plaintiff does here.

Rooney alleged, just as McClain does here, that the delay had been caused by the corporation's own default, and that extra work had been ordered and alterations made by the engineer which entitled him to an extension of time. These allegations were controverted by affidavits.

In their facts, no two causes more nearly alike could be found than that and this case.

The decision was that the corporation was not, by any default of its own, disentitled to its legal remedy under the contract, namely : to take possession and finish the works. The Vice-Chancellor declared that he had no power to question the correctness of the engineer's judgment that the work was not progressing with sufficient rapidity.

Another decision of the Vice-Chancellor's was that if Rooney was wronged by permitting the corporation to take possession and finish the works, he had an abundant remedy in damages.

Garret v. Branstead, and Epsom Downs Ry. Co., 4 De. G. J. & S's Rep., 461, also cited by counsel for plaintiff, it being a strong illustrative case.

Garret contracted to build a certain works for the company. In the contract was a stipulation, that, if in the judgment of the company's engineer, Garret should fail in

the due performance of this contract, the company could, by its engineer, take the further performance of the contract out of his hands and finish it at Garret's expense. There was also an arbitration clause by which all disputes were to be submitted. Garret brought a suit in equity in which he charged, just as McClain does here, that he had been delayed in the execution of the contract by he conduct of the company; that the engineer who was also the arbitrator, had unfairly and improperly neglected to measure and inspect the work done by the respondent under the contract and had refused to grant him certificates in accordance with its terms; that the engineer had improperly put in force the clause of the contract which, as I have recited, authorized him for the company, te take possession and finish the work. One of his prayers was for an injunction to restrain the company from taking possession of the works. This was granted by the Vice Chancellor.

Of this, as of the other case, I may say that it is a brother of the case at bar, and they look so much alike that it is impossible to identify one from the other.

The reviewing court reversed the Vice-Chancellor. Upon the question, whether the delay in finishing the works was due to him or arose from acts of the company, the court refused to give a final opinion. But it was declared that the case was put into this position: "If the contract had not been duly observed' (by the defendant,) then, under the 13th clause, the company has a right to take the further performance of the contract out of the contractor's hands, but it is now a question of doubt, whether the contract has been duly observed or not."

Then comes the question of comparative injury; whether the greater injury would be done to the contractor by taking the contract out of his hands and the railway company themselves completing it, or whether the greater injury would be done to the railway company by allowing the contractor to continue the completion of the contract.

"Upon the question of comparative injury, I entertain no doubt whatever. If, on the one hand, the possession is given back to the contractor, and he is allowed to complete his contracts and he does not complete it, or completes it in an improper and insufficient manner, the court has no power to interfere; it cannot see to the due completion of a contract of this kind. If, on the other hand, the contractor is improperly disturbed and turned out by the railway company, he has a perfect and sufficient remedy in damages against the company."

With all the instruction imparted by these authorities and under the illumination shed by them, the solution of the questions made by McClain's motion is easy.

It may be conceded that there is doubt whether the delay in completing the hotel building was the fault of McClain or of the plaintiff company. It may be conceded that it is difficult to say now whether the claim of McClain for extras is meritorious or not.

It may be conceded that there is doubt as to the validity of the award of the arbitrators. It may be conceded that there are two sides to the question whether there are definite plans by which the building can be completed.

But these concessions do not entitle McClain to an injunction.

The balance of convenience and inconvenience, the comparative injury to the parties, are the keys by which the problem must be solved.

Suppose possession is given back to McClain, or suppose he is allowed to retain possession. The court would be powerless to compel him to complete the building. It is absolutely without power, unless the judge is made an arbitrator, to tell McClain what plans should govern him in completing the building. True, he has expressed a willingness for the court to do that. But his refusal to object to the court exerting a power which it does not possess, does not preclude the court from declining an investigation which is unfit for a court of equity. Nor has the court any power to order the plaintiff to pay to him his claim for extras before final hearing. Upon this posture of facts one would be blind who could not see, by the uncontradicted evidence regarding the contemplated rents of the building, that the plaintiff would be irreparably injured. The liquidated damages of $70.00 for each day's delay is no compensation for the injury.

On the other hand, suppose the plaintiff is allowed to retain possession, or to go into possession, and finish the building; for every injury which the defendant thereby sustains he would have an abundant and an adequate remedy in damages. The law furnishes rules by which his damages can be estimated.

An adverse decision on the defendant's motion can be planted on another ground.

To the arbitrators two questions were submitted. One was whether McClain was justified in stopping work on the building, and whether he should resume the work, and the other was the merit of his claim for $65,-000.00 for extra work and materials.

The arbitrators decided in favor of the plaintiff. Their decision was agreed to be final. Unless the defendant has raised a fair and substantial question as to the validity of the award, it concluded all of the rights of the parties. He must. by his evidence, have raised a fair question, whether the award is not vitiated by fraud, fraud in the aribtrators or in the arbitration. The first impression from reading the depositions of the arbitrators was that the arbitrators did not give the defendant an adequate hearing; that the matter had been railroaded through. But on reading the depositions a second time, I found that it was the questions of the attorneys, and not the answers of the arbitrators, which made that impression. I found the questions did not contain all of the testimony.

The arbitrators were the chancellors, judges and jurors for these parties. McClain de-

sired that they should decide that he was entitled to his bill for extras, and also that the company had damaged the plans of the building on him. They had the contract before them; they had before them the facts as to when the alleged revised plans had been drafted, and that McClain had worked for months, and had erected parts of the building, upon these very plans. That presented a question of law, whether McClain, after such conduct, had any right to object to the plans, or to raise the question that there were no plans, or that they had been revised. They ascertained that the contract ordained that no claim for extra work was good unless the extra work had been ordered by a notice in writing, which was not given by the plaintiff. That presented a question of law whether McClain's bill for extras was not groundless.

Being chancellors and judges, they were empowered to decide these questions. They may have decided them erroneously, but that falls short of even tending to prove fraud or corruption, actual or constructive. It is true they refused to hear his experts on the question of the revision of plans. But this did not make a case where he had no opportunity to be heard. In effect he offered his evidence. Upon consideration, they decided to reject the evidence. Questions touching the reception and rejection of evidence come within their province as chancellors and judges.

If McClain had been building on the so-called revised plans for several months, as the undisputed evidence showed, that fact made it, at least, doubtful whether he could agitate that question. I am not unmindful that the testimony of the arbitrator does not disclose that this was their reason for declining to hear the experts. Still it was a reason they could have given. The fact being before them, the only question is, was this decision not to hear the evidence, probably right? and not whether it was actually right. Their decision may be deemed sound, although their reasons are unsound. The decision itself may be erroneous, and yet that does not justify the conclusion that there was fraud.

Again; the arbitrators had before them the contract and its supplements. The resolution of March 1st, 1895, together with the acceptance of its terms by McClain, constituted one of the supplements to the contract. By that resolution and his acceptance, McClain "in consideration that the fronts of the building were changed from classic to Romanesque, agreed to provide for the extra iron and material in sufficient quantities to carry all loads and make the building absolutely safe, without extra compensation over the original contract price, of $345,000.-00."

As I read their testimony, they construed that to mean that no matter what extra labor and materials were necessiated by changed or revised plans, or any other cause, McClain was to have no extra compensation. That decision made McClain's expert evidence to show a revision of the plans immaterial and unimportant; for if he could not be allowed his bill for extras, what value had it?

I do not say that their decision was sound. I is sufficient that, being chancellors and judges, they had the power and right to decide the question. That it was simply erroneous does not help McClain; it does not prove fraud.

Awards of arbitrators cannot be set aside for their mistakes of law unless they appear on the face of the award. Swasey v. Lycock, 1 H. 334.

There was a good deal of either banter or self-deception in the contention of McClain that the plans had been changed or revised. It is a mere jugglery of words. By skillful manipulation of the nomenclature of architects, one can make a plausible showing for almost any claim. It may sound dogmatic; but the truth is there were no new plans made. The plans may have been changed or revised, the changes being made necessary by the supplemental contracts. But what if they were changed or revised in that way? McClain knowing the changes were made, and having acted upon them, he was not released from his contract; nor was he justified by that in stopping the work.

Kennedy said the revised plan "provided for a building different in certain arrangement for the Opera House portion, and a rearrangement of the plumbing fixtures in the hotel portion." The change in the Opera House was fully explained, and so was the change in the plumbing fixtures, and the uncontroverted evidence proved that McClain assented to both changes, and was, or will be paid for those changes.

Kennedy also testified that the revised plans, at various points, required, on the whole, more work and material than the original plans exacted.

The claim that more iron was needed was given a conspicious place. But the testimony of Schriever shows that he figured for the iron by the original plans, and that the quantity was as large as that furnished by McClain according to the so-called revised plans.

Kennedy also testified that the interior arrangement was practically the same by the revised as the original plans, but that n provision was made by the latter for carrying the roof garden, and that changes made in the walls were for McClain's benefit, being less in width Some columns had to be made heavier; but McClain consented to all that; and was it not "extra iron and material" to carry a load, for which he was to have no extra compensation under his agreement of March 1st, 1895?

Again, this witness (Kennedy) spoke of the original details not being full enough. By the revision they were made into "full sized working details."

There was no change made in the number of the rooms, and the brick walls are practically in the locations as provided for by the original plans.

And finally Kennedy said the so-called revised plans "grew out of McClain's contract." That means that they were made necessary by the terms of the contract, not only the original contract, but also the supplements made to it, from time to time, and especially that of March 1st, 1895.

Under the illumination of the evidence filed, I cannot avoid saying that the changes made in the original plans have been magnified by McClain. They are a mere pretext for not completing the building.

Having acted upon them, in the erection of the building, for several months, with full knowledge of their character and scope, his refusal to continue its erection because he did not know upon what plans he was to work, has all of the features of a subterfuge. I am not persuaded that it is the real reason for refusing to go on with the work.

His bill of $65,000.00 may not be a fable or a romance; but he had no right to make a city of refuge of it to escape from the performance of his contract obligation to finish the building. The right to extras has been so much abused in the system of contracting, that it is becoming tedious. It is no wonder that people who are about to build have iron-clad stipulations against them put into their contracts. If McClain had a meritorious claim or extras his equitable course was to not mingle it with the question of finishing the building. He should have gone on with the work and made the claim for extras a matter of separate consideration and controversy. There was no insolvency of the plaintiff to excuse such a course.

McClain's letter of March 4th, 1896 demonstrates that he did not stop the work on the building, because he did not know what the plans were. I do not want to be too severe or unjust to McClain, but it looks very much like an effort on his part to introduce into the business of contracting the "hold-up" strategy of a species of Western highwayman. In effect he said to the plaintiff: "Stop; pay my bill of $65,000.00 for extras, or I will not finish the building; until it is paid the contractors and sub contractors will have a vacation, and we will have a little recreation or diversion of litigation in the courts for a couple of years." Meantime the building is liable to burn down or up, or fall to pieces for want of protection from the inclemencies of the weather.

The historic incidents of the Chittenden Hotel litigation in which it required six weeks to take the testimony are still fresh and green in memory. The litigation in this case, as it is mapped out by McClain's pretensions, will be a repitition of that history.

McClain has failed to raise a fair question of the existence of any right to injunctive relief. "He who comes into equity must come with clean hands." "He that committed iniquiy shall not have equity."

A decision in favor of McClain on his motion would suggest the reflection, whether agreements to arbitrate and the awards of arbitrators have any force and virtue. The teaching of the masters of the law should not deprive parties of the benefit of awards made by conclusive evidence. Their value should not be frittered away by courts laying their injunctive hands upon them and suspending their feet for an indefinite time. The parties aggrieved by awards have an ample remedy. For fraud they can have the award set aside. If, in the meanwhile, injury is done to them by the effect of the award, they have a full and adequate remedy by an action at law for damages.

McClain's letter of even date with the award of the arbitrators tends to show that he acquiesced in the award, because, in that letter, the plaintiff is requested to draw up the supplemental contract authorized by the resolution of March 1st, 1895.

It was contended that two of the arbitrators, Siebert and Lanman, were guilty of misconduct which was tantamount to fraud.

The meeting of these two and their reading the contract together, the night before they met to consider the matters submitted to them, did not tend to prove misconduct. The mere fact of an arbitrator obtaining information on a particular point in the absence of one, or even both parties, has been decided to be no ground for obtaining a rule to set aside the award. Crossley v. Clay, 5 C. B., 581.

The fact that The Ohio Savings Bank Company, of which Mr. Siebert is a stockholder and president, had a lease on one of the rooms of the Hotel building did not disqualify him to act as arbitrator, and does not vitiate the award. McClain admitted that he knew when Siebert was selected as one of the arbitrators, or at least before the arbitrators began to consider the disputes submitted to them, that the Bank had such a lease and that Siebert was president. This information was enough to put him on inquiry, and an inquiry prosecuted with reasonable diligence would have possessed him with all of the fats as to when the lease began, and when the bank's lease on its present quarters would terminate. He is chargeable with all the knowledge that he would have derived from that investigation. The award must be treated as if he had all that knowledge. McClain's objection to Siebert as an arbitrator comes too late.

It is unnecessary to occupy any time in disposing of the criticism, that the arbitrators did not act porperly in coming to a conclusion. They may not have observed the ceremonies which would have been observed by three judges who had a case under joint consideration. The criticism is purely technical.

Nor is it needful to dwell on the claim that McClain withdrew his submission before the award was announced; for the overwhelming preponderance of the evidence disproves the claim.

The motion of the defendant is overruled.

Coming now to the motion of the plaintiff for a temporary injunction, I think it ought to be sustained for several reasons. 1.

The building and the ground on which it is situated belong to the plaintiff, the defendant having no interest in or title to either of them. The plaintiff is in possession. The defendant threatens to interfere with its possession by acts which, if carried out, would constitute repeated trespasses.

2. Even if the plaintiff is not in possession, it is entitled to possession, and it is prima facie entitled to finish the construction of the building. That is a legal right which is derived from the contract and the award which is prima facie valid and obligatory upon both parties. The defendant threatens to imperil that right by acts which would constitute repeated trespasses.

Injunction is the appropriate remedy for the prevention of trespasses which, by reason of the persistency with which they are repeated, threaten to become of a permanent nature. Lembeck v. Nye, 47 Ohio St. 336.

3. The plaintiff has shown that it has a clear legal right; that there is a well grounded apprehension of immediate injury to that right; and that there is an obvious necessity for protecting such right which would otherwise be seriously injured or impaired.

Taking into account the balance of convenience to the one and the other party, if the plaintiff should be kept out of possession and not be permitted to finish the building, and that might take place if the injunction should be withheld, irreparable injury would be done to the plaintiff. It is obvious that the law furnishes no measure for computing the damages for such injury.

On the other hand, any injury which might be done to McClain by granting the injunction could be fully compensated in damages. It would not prevent him from recovering his bill of extras, if, on the final hearing, the award should be set aside, and he should establish his right to recover it. Nor would it deprive him of the right to recover the equivalent of any profits which he might make by completing the contract. Nor would it defeat his right, if he has such a right, to recover the equivalent of the profits which he would probably make by doing the additional extra work, and furnishing the addiional extra material that he claims would be required by the so-called revised plans.

It is really not necessary to apply the principle, that a chancelor would refuse to enjoin when a greater injury would result from the granting than from refusing the injunction; because it canont, as a matter of right, be invoked, "when the act complained of is in itself as well as in its incidents tortious."

That is the character of the acts menaced by Mr. McClain if the award is assumed to be impregnable. His threatened acts are, on that assumption, tortious, in themselves and also in their incidents. That being so, it cannot be said that an injury would result to him.

He cannot complain that he is being prevented from doing to the hurt of the plaintiff that which he has no right to do.

Motion of plaintiff sustained.

*Stoddart, Innis, Sater & Thurman,* for Plaintiff.

*Richards & Huggins,* for Defendant.