GLASS *et al.* v. ROWE, *Appellant.*

DIVISION TWO.

| 103 | 513 |
| 109 | 343 |
| 103 | 513 |
| 139 | 87 |
| 103 | 513 |
| 143 | 381 |
| 103 | 513 |
| 156 | 15 |
| 103 | 513 |
| 160 | 664 |
| 103 | 513 |
| 94a | 1617 |

1.  **Agent:** SALE OF LAND : STATUTE OF FRAUDS. Prior to the amendment of the statute of frauds by act of March 19, 1887 ( R. S. 1889, sec. 5186 ) an agent authorized to sell lands was empowered to sign his principal's name to the contract in writing for the sale.

2.  ——— : ———. The power to sell was deemed to include whatever was necessary to make the contract valid and binding.

3.  **Sale of Land**: AUTHORITY OF AGENT OF VENDOR : KNOWLEDGE BY VENDEE.  Where the terms of the agent's authority are contained in a letter to him from his principal and the vendee, with knowledge of its contents, obtains from the agent a contract materially different from that authorized to be made by the letter, and in excess of the powers given by it to the agent, such contract will not bind the principal.

4.  ——— : TIME AS ESSENTIAL ELEMENT OF CONTRACT.  It is competent for a vendor of land to make the time within which the sale is to be completed an essential element of his contract.

5.  **Equity**: SPECIFIC PERFORMANCE.  Equity will not specifically enforce a contract for sale of land unless there be mutuality both as to the obligation and the remedy.

*Appeal from Jackson Circuit Court.*—HON. T. A. GILL, Judge.

REVERSED AND REMANDED.

THIS is an action for the specific performance of an alleged contract, and was commenced on the sixteenth day of May, 1887, in the circuit court of Jackson county, Missouri.   Prior to and on the first day of March, 1886, the plaintiffs were residents of Kansas City, Missouri, and defendant was a resident of Kalamazoo, Michigan. Defendant was the owner of lot 69, in Swope's addition to the said City of Kansas.   J. T. Elliott was a real-estate agent in Kansas City.

On the twenty-seventh day of February, 1886, Elliott sent to Rowe, the defendant below and the appellant here, the following telegram from Kansas City :

"February 27, 1886.

"Can get $150 per foot for Grand avenue lot.   Shall I sell ; if so, name terms.          J. T. ELLIOTT."

To this telegram Rowe replied by letter stating in substance, that he would not accept the offer ; that he had been offered more than that several years before.

On March 1, 1886, Elliott sent this dispatch to appellant :

"KANSAS CITY, Mo., March 1, 1886. ·

"Letter received, wire me your very best figures and terms to sell at.        J. T. ELLIOTT."

To this second telegram, Rowe wrote a reply as follows:

"KALAMAZOO, MICH., March 1, 1886.
"*J. T. Elliott.*

"DEAR SIR:—Your telegram of to-day received. In answer will say that, on December 8, I refused $250 per foot, $12,000; afterwards was asked if '$275 would buy it,' or words to that effect. I then offered the property at $300 per foot until February 1, cash down, and heard nothing more from the parties. Will *now* sell at $350 per foot. *All funds payable to my order through bank or express office.* A regular commission of two and a half per cent. to you *after sale is made and closed.* Reserving the right that if sold by any other parties you receive no commission. *This bargain good for twenty days, as I do not care to be tied up with my property for a longer time.* Terms, half cash; balance one and two years at eight per cent.

"T. H. ROWE."

In reply to this letter, Elliott wrote as follows:

"KANSAS CITY, Mo., March 8, 1886.
"*T. H. Rowe, Esq., Michigan.*

"DEAR SIR:—I have been working hard on our man for the Grand avenue property, and have got him up to $300 per foot; half cash, balance time. Will this buy the property? Please let me know by return mail, and greatly oblige. Yours respectfully,

"J. T. ELLIOTT."

Rowe did not reply to this letter.

On March 10, Elliott sent to Rowe a telegram, as follows:

"KANSAS CITY, March 10, 1886.

"Sold your Grand avenue lot. Will write full particulars.        J. T. ELLIOTT."

And on the same day wrote a letter of which the following is a copy:

"KANSAS CITY, March 10, 1886.

" *T. H. Rowe, Esq., Kalamazoo, Michigan.*

"DEAR SIR:—I have succeeded in selling your Grand avenue lot at the price named in your letter, $350 per front foot; one half cash, balance one and two years at eight-per-cent. interest. Please send your abstract at once, so I can have it brought down to date and examined, and when we get ready for the deed you can send it to the bank here or come down yourself. Please send the abstract by return mail, and greatly oblige. I think you are the luckiest man I ever saw. Everything you buy doubles up and melts into money. I think this is the best sale that has been made in the city for some time. Ground opposite your lot can be had for $250 per foot. I could not have sold your lot at the price mentioned had it not been that the party's brother has purchased the adjoining lot, and they want to put up a building together. There has been quite a boom on Main and Walnut street property for the past few weeks, and, from the present indications, it looks as though things were going to be pretty lively in Kansas City this season. Say, I think you ought to pay me a handsome commission on this deal, because I did not sell your property when you offered it at $8,000. What do you think about it? The party I sold your lot to is a wealthy business man, doing business on Delaware street. Let me hear by return mail, and don't forget to send the abstract. Very truly,

"J. T. ELLIOTT."

At this time Rowe was quite out of health and unable to attend to business and turned the matter over to his attorney, W. G. Howard, of Kalamazoo, Michigan, together with the correspondence thus far had, and instructed Howard to carry out the terms of his (Rowe's) letter of March 1. Howard thereupon wrote to Elliott, March 13, 1886, as follows:

"KALAMAZOO, MICH., March 13, 1886.
"*J. T. Elliott & Co., 605 Delaware St., Kansas City, Mo.*

"DEAR SIR:—Mr. T. H. Rowe of this place has put into my hands, to look after, the matter of the sale of his Kansas City lot, about which he and you have been corresponding, and has handed me the correspondence. He is out of health and cannot look after it. I herewith inclose abstract as requested in your letter, made by McCullum & Edwards to whom Mr. Rowe said you referred him at time it was made. Understand the title is the same now as when abstract was made, except there is a special assessment for grading not paid. When you look it up and are satisfied, let me know. Also send me name of grantee, and I will have the deed executed, and Mr. Rowe wants me to go to Kansas City and assist in closing the matter up: He tells me he is to pay you two and one-half per cent. for making sale, and we expect, of course, that you act for us in looking after our interests in the matter. Mr. Rowe understands that he is not to pay any taxes or assessments already made but not yet due. Do you so understand it? Let me know when you are ready. I do not want to be detained there. Does your state require notarial seal to acknowledgment of deed, or simply county clerk's certificate that the person who acknowledges is a notary? You might send deed filled out to me. Mr. Rowe's wife is named Florence V. Rowe. Please exempt from warranty, if you do send, taxes and assessments not yet due, if that is the custom in selling.

"Yours respectfully,
"W. G. HOWARD."

To which Mr. Elliott replied as follows:

"KANSAS CITY, MO., March 17, 1886.
"*W. G. Howard, Esq., Kalamazoo, Michigan.*

"DEAR SIR:—Yours of March 13 inclosing abstract to the Grand avenue property received and contents

noted.   And in reply say that Mr. Rowe under the con-
tract in the sale of his lot is to pay taxes, special and
general, which were a lien at the time sale was made.
I will send you a deed filled out and in form required
by our law in a few days.   The attorney of the pur-
chaser is examining the abstract, and as soon as he gets
through will send you the deed.   The notary's seal
should be affixed as the law requires this in this state ;
also notary should say when his commission expires.
Tell Mr. Rowe that his interest will be looked after just
the same as if he was here himself.   And I will not
allow him to pay out one cent more than is customary
on sale of property.   Of course, you will be here to take
care of his interest when we get ready to close the
matter.   Just as soon as they get through with the
abstract I will send you the deed properly executed,
and tell you when to come.   Will you be kind enough
to ask Mr. Rowe if there is any incumbrance on the
place and how much ?   Will write again in a few days.
                    " Yours respectfully,
                              J. T. ELLIOTT.

On March 25, 1886, Elliott wrote to Mr. Rowe the
following letter :

            "KANSAS CITY, Mo., March 25, 1886.
" T. H. Rowe, Kalamazoo, Mich.

    " DEAR SIR :—The attorney who is examining your
abstract has been overloaded with work and is not quite
through with the title.   He says there are several mis-
takes in the abstract that will have to be fixed up, but
he thinks it can be done without much trouble.   I will
write you just as soon as they get through with the
abstract and send you the deed for your signature, etc.
                    " Very respectfully,
                              " J. T. ELLIOTT."

On the seventh of April, 1886, Howard under
instructions from Rowe sent Elliott the following
telegram :

"KALAMAZOO, MICH., April 7, 1886.

"*J. T. Elliott, 605 Delaware Street, Kansas City, Mo.:*

"You not having complied with Mr. Rowe's proposition of sale of Grand Ave. lot, he directs me to withdraw the same. Please return abstract at once.

"W. G. HOWARD."

To which Elliott replied, by telegram :

"KANSAS CITY, Mo., April 8, 1886.

"*To W. G. Howard :*

"The purchasers have complied with their contract which is of record. The delay is ours. The abstract does not show good title in Rowe. Title will probably be perfected by Monday next. Shall we send deed or will you come on? J. T. ELLIOTT."

On the same day, Elliott wrote Howard as follows:

"KANSAS CITY, Mo., April 8, 1886.

"*W. G. Howard, Attorney at Law, Kalamazoo, Mich.*

"DEAR SIR :—I telegraphed you this A. M. explaining the causes of the delay in closing the lot sale. The parties purchasing lot have been ready for several days to pay over the money, but on account of the title being imperfect we could not close it. I have the abstracter still at work on the title and think he will have it in shape by Monday next. The parties have thirty days in which to complete their contract from the time of sale and the time is not yet up. The time given was for our benefit and all on account of the abstract. Inclosed you will find letter from one of the parties noting the objections to the title. The abstract does not show title in Mr. Rowe. I, of course, sold the lot with the understanding that the title was to be perfect and so stated in the contract. That contract is on record and was made in good faith and they are now ready and have been for several days to comply with their part of the contract. You had better come down as soon as you get my letter and by that time I will have the title perfected. Say not later than Monday or Tuesday. Hoping to hear from you at once. Very truly,

"J. T. ELLIOTT."

Howard replied as follows :

"KALAMAZOO, MICH., April 12, 1886.
"*J. T. Elliott, Esq., Kansas City, Mo.*

"DEAR SIR:—Your telegram and letter of April 8 is at hand and contents noted.   I am at a loss to understand what you mean.   I telegraphed you that Mr. Rowe withdrew his offer contained in his letter of March 1, the terms of that letter not having been complied with, and asked you to return the abstract. In lieu of doing as requested you write that you have made a contract for sale of property running thirty days, and that it is recorded.   By what authority do you make any contract at all, and by what authority do you make a contract for thirty days?   Have you any arrangement with Mr. Rowe other than that contained in his letter of March 1 ; if so, what is it?   A copy of Rowe's letter of March 1 is before me.   I see nothing in it directing or authorizing you to enter into any contract for him.   I think it would hardly be contended seriously by anyone that the letter is of any such purport.   Again you say that you have had an abstracter at work on abstract for several days.   At whose expense is he at work?   Certainly, Mr. Rowe never directed nor authorized any such work to be done.   I sent you the abstract.   If your purchaser did not like, he was not compelled to take it.   The abstract suits Mr. Rowe.   He had it made by a Mr. Edwards, who was recommended by yourself, as a man exceedingly well versed in the business.   Please look over Mr. Rowe's letter of March 1, carefully, and I have no doubt you will agree with me in regard to it.   You may return abstract by express at our expense.          Yours, etc.,
                         "W. G. HOWARD."

The contract made by Elliott with Austin and Glass is as follows :

" This agreement, made by and between T. H. Rowe, of Kalamazoo, Michigan, and William C. Glass and James H. Austin, of Kansas City, Missouri.

"The said Rowe has this day and does hereby agree to sell and convey to said Glass and Austin, for the consideration hereinafter mentioned, the following described real estate, situated in the City of Kansas, county of Jackson, state of Missouri, to-wit: Lot sixty-nine (69) in Swope's addition to the City of Kansas, as shown and described on the recorded plat thereof.

"The said Glass and Austin are to pay for said lot as follows: $200 cash paid at the time of signing this contract, the receipt whereof is hereby acknowledged; $8,200 to be paid within thirty (30) days from this date; $4,200 to be paid in one (1) year from this date; and $4,200 to be paid in two (2) years from this date, said last two payments to draw eight per cent. per annum from date of passing papers and to be secured by trust deed on property.

"Said Rowe is to pay interest due on any incumbrances on said lot up to the time of making deed. Said Rowe is to furnish complete abstract from government down to date of making deed by him, and the usual judgment certificates, and to pay all taxes, general and special, which are now a lien upon said lot, and, at the time of passing papers, to show a good and complete title to said lot in himself, and free from all and every incumbrance. If any defect should be shown in title said Rowe agrees to cure said defects, and make the title good. If any difficulty should arise in reference to title or incumbrance on property, parties are to have reasonable time, notwithstanding dates herein mentioned, to close the transaction, even after times mentioned herein. Said Rowe is to convey by good and sufficient deed of conveyance, with usual covenants of warranty as to title and incumbrances. If this contract is not carried out by said Glass and Austin according to the intent and meaning thereof, then the amount paid by said Glass and Austin shall be forfeited, and this contract be at an end. If said Rowe fails to carry out

this contract on his part, then he shall refund the said $200 to said Glass and Austin. But it is understood that if it is possible for said Rowe to make title good, and to carry out this contract on his part, it must be done. Deed to be delivered and papers passed and money paid on or before thirty days from this date, except delay caused by reason of any matters hereinbefore stated.

"In witness whereof, we have hereunto set our hands and seals *this tenth day of March, 1886.*

"[ Seal.]                              T. H. ROWE,
"By J. T. ELLIOTT, His Agent.
"[ Seal.]                              WILLIAM C. GLASS,
"[ Seal.]                              J. H. AUSTIN.

"STATE OF MISSOURI, ⎱
                                    ⎰ ss.
"County of Jackson.  ⎰

"On this seventh of April, A. D. 1886, before me, personally appeared William C. Glass, J. H. Austin and J. T. Elliott, agent of T. H. Rowe, to me personally known to be the persons described in, and who executed, the foregoing instrument, and the said Austin and Glass acknowledged that they executed the same as their free act and deed. And the said J. T. Elliott acknowledged that he executed the same as the free act and deed of the said T. H. Rowe.

"In testimony whereof I have hereunto set my hand and affixed my official seal, at my office in Kansas City, said county, the day and year first written above. My term expires August 1, 1887.

                    "D. E. STONER ( L. S.)
"Notary Public of said County of Jackson."

The defendant below, appellant here, having repudiated the contract made by Elliott in his behalf, the respondents began their suit for specific performance of said contract. Defendant denied he had made such a contract, and prayed, by way of affirmative relief, that the cloud on his title occasioned by the recording, in the

recorder's office of Jackson county, the said contract, be removed, and said contract be canceled and defendant's title be quieted.

The cause was tried on June 11, 1887, and respondents obtained judgment. Motion for new trial was duly made and overruled. And appeal taken to this court.

On the trial, the foregoing correspondence and contract were in evidence, and various other letters, written after Rowe, the appellant, had refused to convey.

J. T. Elliott was a witness. He identified the letters and contract, and testified to the fact that, at the time of the execution of the contract, plaintiffs paid him $200 thereon; that when he received abstract he took it to Austin, one of the plaintiffs; that Austin kept it about two weeks. He then took it to an abstracter and had it brought down to date, and he then took it back to Austin; that, when he received notice from Rowe withdrawing the offer, he let Glass and Austin know about it; that Glass came over to his office about April 17, and they went to the bank together; that Glass made him a tender of a check, payment on the contract; that he told Glass he could not accept it.

He was asked by respondent: "What was the usual time of closing up contracts of sale and examining titles at that time?" Objected to because contract fixed twenty days. Admitted. Exception saved. Witness answered from thirty to sixty days. Since then the time given is shorter.

Cross-examination: "Have resided here seven years. I do not remember who owned the property that could have been bought for $250 a foot, that I spoke of in my letter of March 10, 1886. Glass had told me he could buy it for that. Glass' brother lives in St. Joe; Glass told me his brother was talking of putting a building on lot adjoining Rowe's. By the "attorney of the purchaser" spoken of in my letter of March 17, as examining abstract I meant, Mr. Austin, one of plaintiffs; Glass was one of the purchasers. Austin was an

attorney himself; Glass had spoken to me about this property on the twenty-seventh day of February, 1886, at my office. I went to see him but he was not in, and afterwards he came to my office; I told Mr. Glass that I knew the owner of this Rowe property, and I would write to him and give him his price on the property. Glass and I were intimate friends; I told Mr. Glass to make me an offer and I would see what I could do for him, and he made me the offer of $150 a foot; I telegraphed the offer to Rowe; I would have sold this property to Glass for $150 a foot if Rowe had given a favorable answer to my telegram; it would have been perfectly legitimate for me to have sold it to him for $50 a foot if I could have got Mr. Rowe's consent; I had nothing to do with the real value of the property; a man is supposed to know the value of his own property; this lot is forty-eight-foot front; $150 a foot was less than Mr. Rowe had asked for the property five or six years before; the fact that values had been advancing all the time in Kansas City would not make any difference to me; I would submit any offer if it was only ten cents; I do not know when the property across the street was offered for $250 a foot; Mr. Glass told me that it was offered for that; I would take his word for it; he is a truthful man.

"I showed Rowe's letter of March 1, 1886, to plaintiffs at the time the contract was written; after I got the telegram of April 7, withdrawing the offer, I went and saw Glass and Austin; I must have signed and acknowledged this contract the same day; I do not know anything about the recording of the contract; I have got a headache so this afternoon that I cannot state why I spoke of the contract being recorded in my letter April 8. I have got the $200 that was paid to me by the plaintiffs; Mr. Glass came to me at the time the tender was made and requested me to go to the bank with him in order that he might make the tender, and I went."

Redirect examination :    " This $200 was paid to me in Mr. Austin's office where the contract was written ; I remember of acknowledging this contract ; it was acknowledged in Mr. Austin's office ; I do not remember that it was written some time before it was acknowledged ; I was at Judge Austin's office a great many times concerning this sale.

" Q.    You do not know whether you acknowledged and signed this contract at the same time or not ?    A. I do not remember about that now.

" Q.    You went to his office and you signed it there, and you acknowledged it there, but you do not recollect now whether you acknowledged and signed at the same time or not ?    A.    Of course I do ;' yes.

" Q.    You say you acknowledged and signed it at the same time ?    A.    Certainly."

The plaintiffs then called as a witness, J. H. Austin, who testified in substance as follows :    " I am one of the plaintiffs ; I have no recollection of seeing or talking with Mr. Elliott about the purchase of this lot, until the day he and Mr. Glass came into my office for the purpose of writing up this contract that has been spoken of and offered in evidence.    Mr. Glass and I had had several conversations about the purchase before that time ; after considerable talk I consented to take a half interest in the property, at $350 a front foot, which I considered the top price at that time.    I hesitated very much about giving that price for the lot at that time. It seems strange to say this the way the property has gone up since, but that is a fact.    Upon the tenth day of March Mr. Glass and Mr. Elliott came to my office, and I think at the time this contract was being written I saw this letter that Mr. Elliott had, in which Mr. Rowe offered to take $350 per front foot.    1 did not notice it specially, except for the purpose of finding out what the price was.    I then sat down and wrote this contract.    The $200 was paid at the time of signing this contract.    I should judge that I got this

abstract about the seventeenth day of March; the first thing I struck in the title was transfer number 2, in a conveyance from Henry Childs and wife to Oliver Cadwell; there was no separate examination of the wife; and number 3 was the same, and there was a mistake in transfer number 14, and I thought the power of attorney from Downton and Kinniard to Thomas Smart; I thought the acknowledgments defective; I found these defects were applicable to all the titles in that addition. The abstract was not brought down to date; it showed title in Charlotte Ulery; the certificate to the abstract was May 31, 1881.

"I went over to Mr. Karnes to ask him about the acknowledgments of Smart as attorney in fact for Downton and Kinniard. The acknowledgment I thought was imperfect in this respect, that the attorney in fact acknowledged that he executed and delivered the same as his voluntary act and for the uses and purposes therein mentioned. He did not acknowledge it as the act and deed of his principals. The deed was signed in the name of the parties by Thomas A. Smart, attorney in fact. It did not say as attorney in fact in acknowledgment. Mr. Karnes told me that Mr. W. G. Elliott was fixing up the matter; then I went to see Mr. Elliott about the matter. After keeping the abstract a couple of weeks I returned it to Mr. J. T. Elliott and told him it was imperfect. I gave him a memoranda of the imperfections, and told him to take it to the abstracter and have it brought down and the imperfections corrected; after the abstract came back I found out another matter I did not know at that time. It is a fact that, under the power of attorney in which Mr. Smart acted in making these conveyances were not given upon the abstract at all. The power of attorney here given is one dated in 1868, and the deed he made was in 1867; that was an oversight of my own. There were two others on the record under which he could act. There was one signed

Jonathan Kinniard to Smart, dated 1866; there was another one signed by Mrs. Downton; another one signed by Mrs. Kinniard separately, in 1866; then in 1868 they all joined together and made a power of attorney, but I found that power of attorney was not sealed. It was shown upon this abstract as sealed. I found upon the records afterwards that it was not sealed. This last power of attorney did not ratify any previous sales. I satisfied myself, upon inquiring of several persons, that this defect could be fixed up by quitclaim deed. When I returned this abstract to Mr. Elliott, he took it to an abstracter, and it remained in the abstracter's hands ten days or two weeks. I think we made up our minds to take the property at the time we made the tender, which was along about the seventeenth day of April; Mr. Elliott says it was the seventeenth, but Mr. Glass will know about that. This contract was signed by the parties on the tenth day of March; after this telegram of April 7, that was received, it was suggested that it should be acknowledged in order that it might be recorded. Mr. Elliott and Glass came to my office and the acknowledgment was taken there.

"*Q.* What kind of speed, considering the inquiries you had to make, did you make in getting through this title?" (Objected to by defendant's counsel, as incompetent, immaterial and irrelevant. Objections overruled and exceptions taken.) "*A.* I think I was moderately speedy and diligent in my affairs, as much so as I am in any title; I felt that we were giving a good price for the property and these parties ought to fix it up. I felt that I should not do the running around; they should do it. Afterwards the property appreciated and we were anxious to get it."

Cross-examination: "I had the letter of Mr. Rowe, of date March 1, at the time the contract was drawn. The contract was acknowledged after the receipt of the telegram of April 7. I knew of that telegram before the contract was acknowledged; in regard to the time when

we agreed we would take the property, I will have to rely' upon my letters for the dates. I considered this purchase a fine investment, and that the property would improve in value ; I must have had some information from some source that led me to think so. I may have heard about the new hotel project. I know one of the inducements for my buying the property in that neighborhood was from the fact I had information that the hotel was going up there some place.''

W. J. Elliott was sworn as a witness in behalf of the plaintiffs and testified in substance as follows : "Mrs. Warner sold a piece of property in this same addition, and when the abstract was turned over I found the defects and was employed by her to have them corrected ; her contract was made on the fifteenth day of March ; I made inquiries of some of the old settlers and found Downton and Kinniard formerly lived in Kentucky ; I wrote to several parties in regard to them ; I had several conversations with Mr. Austin, one of the plaintiffs, in regard to it. He had learned I had investigated the Downton and Kinniard claims ; I learned from an attorney in Kentucky that the Kinniard heirs were scattered over Iowa and other states and that Mrs. Downton was the sole devisee under her husband's will. I found that this will was defective ; I do not recollect the dates of my conversation with Mr. Austin. Mrs. Warner's contract was dated March 15, and she did not close the trade until June ; we had to finally send Lee Talbott down there to get the quitclaim deed from the Downton heirs ; I had an office on the same floor with Mr. Austin and we conversed frequently about the matter ; my recollection is that I informed him of the progress of this correspondence but I have nothing to fix dates. Mr. Austin said that the specific trouble with the abstract was that the husbands and wives did not join in the power of attorney ; I finally got a quitclaim deed.''

William C. Glass, one of the plaintiffs, was called as a witness in his own behalf and being examined by Mr. Austin, the other plaintiff, testified in substance as follows:  "I am one of the plaintiffs in this case; I have been acquainted with J. T. Elliott for some time in this city; I had some real-estate dealings with him. I cannot say how many or how often; I got pretty familiar with him; I was in Mr. Elliott's office one morning and he brought the subject of the sale of this Rowe lot up and wanted me to make him a proposition; Mr. Austin and myself offered him $150 a foot and he was to submit the proposition to Mr. Rowe, then the correspondence took place that has been introduced in evidence.   If I remember, the contract in question was not made on the tenth of March, 1886; I do not believe it was acknowledged at the time it was signed; this contract was acknowledged about the time that Mr. Rowe seemed to get excited over the matter in some shape, and got it withdrawn or pretended to withdraw his contract.

"In talking with you I believe it was· considered policy to record the contract, that was on or about April 8, 1886.   About this brother business, I think Mr. Elliott is mistaken; I have no brother living in St. Joe; I have one living in Sedalia.   We did not own any property adjoining this lot, but did in the same block some two or three lots from there.   I considered the price, $16,800 pretty stiff for it at that time.   The property stands about thirty-five feet above the grade, I should judge.   There is an old dilapidated house on it. In regard to this tender that I made to Elliott, my recollection runs that it was about the seventh or eighth of April; I think that this tender was made at your suggestion; that you told me that we had better tender that money to them; I met Mr. Elliott in the bank of Kansas City and I proposed to give him a check, and this first payment was to be deducted or kept out, and the

Glass v. Rowe.

taxes and one thing and another ; I do not remember just the amount now you claimed was against the property, special taxes and one thing and another ; Mr. Elliott refused to accept it; we left the bank and went over to your office and I explained to you what we had done ; Mr. Elliott said he had not authority to accept it, or something to that effect. At the time the contract was made, my recollection is that each of us gave an individual check for $100.''

Cross-examination : '' Mr. Elliott represented ' to me that a non-resident had some property on Grand avenue, and that he thought could be bought cheap, and wanted me to make a proposition ; he told me that he had not had any correspondence with the owner for some time, but if I wished to make a proposition he would submit it ; he wrote a telegram out in his own office and we walked forward to the front of the store. The telegraph office is in front of the store and we sent it.   I was familiar with the value of property in that block ; I was about as well posted in that block as any man in the city.   I did not think at that time that the property would sell for any more than $150 a foot ; on · March 10, we agreed to pay $350 a foot for the property ; the value of property jumps pretty rapidly here sometimes.   My brother and I did not propose to put up a building jointly.   I have no recollection of telling Mr. Elliott anything of the kind ; I told him that I would like to be in that block on that side of the street. I thought Mr. Elliott knew all the time that Mr. Austin was with me in this purchase.   My recollection is that I told Mr. Austin once or twice to waive any technicalities and wind the thing up one way or another.   I told him this some time between the seventeenth of March and the eighth of April.   At the time this contract was acknowledged, Mr. Austin, Mr. Elliott and myself met by mutual agreement in Austin's office and sent out for Mr. Stoner to take the acknowledgment ; I presume I had seen the telegram of April 7 before the

Glass v. Rowe.

acknowledgment. After it was acknowledged we had it recorded."

*Howard & Roos* and *Warner, Dean & Hagerman* for appellant.

(1) Under the evidence in this case, Elliott was not the defendant's agent at all for the purpose of entering into any written contract whatsoever. Elliott was acting simply in the capacity of a broker, whose sole duty it was to find a purchaser for the lot in question, and to bring the purchaser and the defendant together, when they could contract for themselves. This, we understand from the following authorities, to be the sole power and duty of a broker: *Morris v. Ruddy*, 20 N. J. Eq. 236; *Glentworth v. Luther*, 21 Bar. 21; *Coleman v. Carr*, 18 Bar. 60; *Duffy v. Hobson*, 40 Cal. 244; *Barhard v. Monnot*, 3 Keyes (N. Y.) 203; *Ryon v. McGee*, 2 Mackey (D. C.) 17; *Rowan v. Hyatt*, 45 N. Y. 138; *Stewart v. Wood*, 63 Mo. 252; Story on Agency, sec. 82; *Taylor v. Merrill*, 55 Ill. 53; *Bissell v. Terry*, 69 Ill. 184; *Gilbert v. Baxter*, 71 Iowa, 327; *Armstrong v. Loue*, 18 Pac. Rep. (Cal.) 758; *Miller v. Kleb*, Atl. Rep. (N. J. Eq.) 646; *Stillman v. Fritzgerald*, 37 Minn. 186. (2) If the court should hold that, under the evidence, Elliott did have authority to bind Rowe by a written contract, he certainly had no authority except that shown by defendant's letter of March 1. The contract entered into by him in the name of the defendant so far exceeded the authority he had by virtue of that letter as to make it inoperative upon the defendant. Under this proposition, we desire to call the attention of the court to the following cases in addition to those above cited: *Kyle v. Cavanaugh*, 103 Mass. 365; *Bates v. Nellis*, 62 Mich. 445; *Van Valkenburg v. Rogers*, 18 Mich. 180; *Seibold v. Davis*, 67 Ia. 561; *Gates v. Gamble*, 53 Mich. 181; Parsons on Cont. [7 Ed.] 475-6 and 7; *Gilbert v. Baxter*, 71 Iowa, 327;

*Corcoran v. White*, 117 Ill. 118; *Strange v. Crowley*, 91 Mo. 295; *Wright v. Weeks*, 25 N. Y. 153; *Davis v. Shields*, 26 Wend. 341; *Ramsey v. West*, 31 Mo. App. 776; *Ahern v. Ayers*, 38 Mich. 692; *Lincoln v. Preserving Co.*, 132 Mass. 129; *Ellsworth v. Randall*, N. W. Rep. June 29, 1889; *Bradford v. Limpus*, 10 Ia. 35; 13 Va. Law Journal, No. 21, May 23, 1889. (3) It would be inequitable and unjust, under the evidence in this case, to decree a specific performance. "In cases of fraud the court will not only not perform a contract, but will order it to be delivered up to be canceled." Frye on Specific Performance, sec. 233, and note. It is enough, generally speaking, to induce the court to refuse , performance, if there are any circumstances about the making of the contract which render it not fair and honest to call for its execution. Fry, sec. 241. Application for specific performance is addressed to the sound discretion of the court, and it is not a matter of course that it will be decreed because a legal contract exists. *Race v. Merton*, 86 Ill. 94; *Goss v. Jones*, 73 Ill. 508; *Casey v. Hall*, 81 Ill. 160. It is never admissible that one man should enforce a contract to the disadvantage of another in a court of equity, which he has obtained through falsehood, duplicity or betrayal of confidence. *Mitchell v. King*, 77 Ill. 460. Upon this question of specific performance see, also, 2 Story's Eq. Jur., sec. 742; *Fish v. Leser*, 44 Mo. 272; *Isaacs v. Skrainka*, 95 Mo. 517. (4) The trial court erred in receiving evidence of custom in regard to the making of contracts for the sale of land by agents in Kansas City against the objection of defendant. Custom can never be relied on to change a contract or extend the authority of a special agent. Bishop on Contracts, sec. 454; *Lamb v. Henderson*, 63 Mich. 302, and cases there cited. (5) The trial court erred in admitting in evidence, against the objection of the defendant, the abstract and certified copies of deeds and powers of attorney, because, under the evidence, it does not appear that the

Glass v. Rowe.

defendant was in anywise bound to furnish an abstract of title, and for that reason it could make no difference whether the abstract was defective or not. *Gilbert v. Baxter*, 71 Iowa, 327. (6) The court below erred in overruling the defendant's motion for, a new trial, because, under the evidence in this case and the law applicable thereto, the decree of the court should have been in favor of the defendant. This motion should have been granted, upon the grounds stated in said motion. (7) The decree in this case cannot be upheld, not only because of the reasons heretofore given, but also because it requires the defendant to procure his wife's signature to the deed releasing her dower. Neither the court nor defendant has any jurisdiction over the defendant's wife in that respect. She neither bound herself by a contract nor authorized anyone to so bind her, nor is she a party to this suit. (8) The court below by its decree makes Rowe account for rent of property, but charges plaintiffs no interest, and not all of the contract price.

*Gage, Ladd & Small* for respondents.

(1) Elliott was authorized as Rowe's agent to make a written contract of sale. *Smith v. Allen*, 86 Mo. 178. (2) The parties, by their subsequent acts and conduct, gave a practical interpretation of the nature and extent of the authority intended to be conferred on Elliott by Rowe. Elliott wrote to Rowe for the abstract "to be brought down and examined." Rowe sent it. Elliott wrote to him regarding his obligations in the contract to pay taxes and assessments. Rowe did not dissent, made no objection—did not answer. *LeRoy v. Beard*, 8 How. (U. S) 451. (3) The contract made by Elliott was within the limit of his authority, and not in excess of it, in any particular material to this case. Mechem on Agency, secs. 280, 311, 414; 2 Sugden on Powers, top p. 68, *et seq.;* Story on Agency

[ 4 Ed.] pp. 57 to 61, 166 to 173 ; *Pickert v. Marsten*, 32 N. W. Rep. 551 ; 1 Am. Lead. Cases, 563-4 ; *LeRoy v. Beard*, 8 How. ( U. S.) 451 ; *Mastin v. Grimes*, 88 Mo. 478 ; *Smith v. Allen*, 86 Mo. 178 ; *Herryford v. Turner*, 67 Mo. 296. (4) The contract was not an option contract, forfeitable by the purchasers by virtue of their own default under penalty of loss of the $200. It was the very opposite, forfeitable only at the election of Rowe, and the provision complained of was solely for the benefit of Rowe. Taylor's Land. & Ten., sec. 492 ; 2 Addison on Con. [Morgan's Ed.] sec. 525 ; *Wilcoxon v. Stitt*, 65 Cal. 598 ; 4 Pac. Rep. 629 ; *Knight v. Railroad*, 70 Mo. 237 ; *Ramsey v. West*, 31 Mo. App. 776 ; *Mason v. Caldwell*, 5 Gil. ( Ill.) 196 ; *Barber's Ex'rs v. Brookey*, 3 J. J. Marsh, 511 ; *Cartright v. Gardiner*, 5 Cush. 281 ; *Manning v. Brown*, 10 Me. 49 ; *Danna v. Investment Co.*, 44 N. W. Rep. 55 ; *Hale v. Cravener*, 21 N. E. Rep. 535-37. ( 5 ) The provision in Rowe's letter of March 1, " This bargain good for twenty days, as I do not care to be tied up with my property for a longer time," has reference on its face to the time allowed Elliott to make a sale, and not to the period within which the contract of sale must be carried out. The circumstances of the case also render the latter construction unreasonable and impossible. ( 6 ) There is no want of equity or injustice or wrong of any kind in the case made by the plaintiffs below. Rowe was not defrauded or misled or influenced in any degree by any representation, true or false, but acted independently and upon his own knowledge of the circumstances and his judgment. He, did attempt by every possible means to prevent the completion of the contract, but Glass and Austin were guilty of no such conduct. ( 7 ) The admission of improper evidence would not be ground for reversal of the case, and there was no improper testimony admitted. ( 8 ) The complaint regarding the failure to allow Rowe interest on the purchase money during his default is without merit. His money was not

withheld or detained from him. His refusal to go on with the contract was the only reason why he did not get it. ( 9 ) The court properly decreed a conveyance containing a release of dower. There was in the case no suggestion of difficulty on the part of appellant in procuring his wife's release of her dower. If he found her refractory he did not set it up as an excuse for not making the deed. If she proves so, he can make his own deed and come into court with compensation for his failure in respect of her dower and the decree will be satisfied in that way. There was no exception or objection to this part of the decree; it is not mentioned in the motion for a new trial and is an afterthought. *Schoonmaker v. Bonnie,* 23 N. E. Rep. 1106; *Northrup v. Gibbs,* 1 N. Y. Sup. Ct. Rep. 465.

GANTT, P. J.—In every contract, however simple, or however complicated, the primary right of the party who is to receive the benefit is always a right to have the very thing done or omitted, which the other party promised to do or omit, a right to the specific acts or forbearances for which the agreement stipulates. Pomeroy on Contracts, sec. 2. And, because it so often happens upon the breach of many contracts that a mere pecuniary payment was utterly inadequate relief, there early arose the jurisdiction in courts of equity to enforce specific performance of contracts.

In the administration of this right certain formulas became common. Thus it was said, it was discretionary with the chancellor in each case, whether he would grant specific performance, but this discretion was not to be arbitrary and capricious, synonymous with the mere pleasure of the judge, but a sound judicial discretion, controlled by the established principles of equity as applicable to the facts in each case. Hence, in this cause, as in every suit for specific performance, we must inquire, whether the respondents were, according to legal and equitable principles, entitled to the decree they obtained in the circuit court.

Whatever right respondents have to a conveyance of the lot in suit is referable to, and based upon, the correspondence between appellant Rowe, and J. T. Elliott on March 1, 1886. Appellant's contention is that Rowe's letter simply constituted Elliott a broker, with power to find a purchaser, and gave Elliott no power to bind Rowe by any contract of sale, and, in support of his position, cites the decisions of many eminent courts, among others: *Duffy v. Hobson*, 40 Cal. 240 ; *Gilbert v. Baxter*, 71 Iowa, 327 ; *Morris v. Ruddy*, 20 N. J. Eq. 236.

But we think the rule in this state, prior to the amendment of our statute of frauds in 1887 ( R. S. 1889, sec. 5186 ), was well settled, that an agent who was authorized to sell lands had authority to sign his principal's name to a contract in writing for the sale, and it was based on the ground that the power to sell included whatever was necessary to make the contract of sale valid and binding. *Stewart v. Wood*, 63 Mo. 252 ; *Smith v. Allen*, 86 Mo. 178 ; *Lyon v. Pollock*, 99 U. S. 668. So as to this first proposition of the appellant, we must rule that, if it shall appear that Elliott made a contract strictly within the scope of the authority given in that letter, and signed Rowe's name to it, Rowe, in the absence of fraud, would be bound thereby.

On the other hand, we hold, that if, upon investigation of the evidence in the record, we find that respondents had read the letter of Rowe to Elliott of March 1, 1886, and knew the extent of his agency, and notwithstanding this knowledge afterwards obtained from Elliott a contract of sale, differing in many material respects from that which the letter authorized, and in excess of the powers delegated to him, then respondents cannot maintain their suit, and are not entitled to the decree made in their favor. *Taylor v. Merrill*, 55 Ill. 53 ; *Bissell v. Terry*, 69 Ill. 184 ; *Corcoran v. White*, 117 Ill. 118 ; *Gilbert v. Baxter*, 71 Iowa, 327.

II. We come to consider, then, the letter of March 1, 1886. To properly construe this correspondence it must be borne in mind, that Glass and Austin resided in Kansas City, where the lot they proposed to purchase was situated; that Elliott proposed to Glass the idea of buying this lot. The record discloses that at this time real estate in Kansas City was advancing with marvelous rapidity. Rowe, who owned the lot, lived in Kalamazoo, Michigan. Elliott, after a consultation with Glass, wired an offer of $150 per foot for the lot. Rowe declined it.

Thereupon Elliott sent this telegram :

"KANSAS CITY, March 1, 1886.

"Letter received. Wire me your very best figures and terms to sell at. J. T. ELLIOTT."

Rowe the same day answered :

"KALAMAZOO, MICH., March 1, 1886.

"J. T. Elliott.

"DEAR SIR :—Your telegram of to-day received. In answer will say that, on December 8, I refused $250 per foot, $12,000 ; afterwards was asked if '$275 would buy it,' or words to that effect. I then offered the property at $300 per foot until February 1, cash down, and heard nothing more from the parties. Will now sell at $350 per foot. All funds payable to my order through bank or express office. A regular commission of two and a half per cent. to you after sale is made and closed. Reserving the right that if sold by any other parties you receive no commission. This bargain good for twenty days, as I do not care to be tied up with my property for longer time. Terms, half cash ; balance one and two years at eight per cent.

"T. H. ROWE."

In this letter, Rowe discloses that he knows his property is advancing. He is unwilling to tie it up. Immediately upon receiving this letter it is shown to Glass and Austin. Indeed, throughout the whole

transaction, Elliott is found disclosing to Glass and Austin the correspondence of his principal. In all, but the form, he was active in serving their interests. What authority then did this letter confer, waiving for the time the bad faith of Elliott and respondents' knowledge thereof; we think that it *empowered* Elliott to make an *actual sale*, to be completed in the twenty days from March 1, 1886. We hold that the time limited was, under the circumstances, the very essence of the power granted. To hold otherwise, would do violence to the whole scope of the letter and render the plainest language meaningless. Glass and Austin, the latter a lawyer, knowing of this letter submitted the $300 offer, and, finally on the tenth of March, acceded to the $350-a-foot proposition.

The able counsel for respondents urges upon us, that the time after the tenth of March was too short to enable them to complete the examination of the abstract before the twentieth of March. We are not able to discover any equity in his case on this account. It is apparent that Glass and Austin were fully aware of the limit Rowe had imposed. He had a right to say he would not tie up his property. They were on the ground, they knew better than Rowe of the improvements that were enhancing the value of this lot. They could have closed the trade but, instead, they saw fit to have Mr. Austin prepare a *contract of sale*, *giving them an extension beyond the limit fixed by Rowe*. Elliott was not authorized to make a contract of sale extending the time for completion beyond the twenty days, and respondents with full notice of his power are in no position to complain of his action.

That it is competent for a vendor to make time essential, especially when property is fluctuating, as in this case, we have no doubt. If Elliott could tie Rowe's property up beyond the twenty days for thirty days, he could have done so for six months or a year. Pomery on Contracts, sec. 390; *O'Fallon v. Kennerly*, 45

Glass v. Rowe.

Mo. 124 ; Waterman on Spec. Perf., sec. 459 ; *Hepburn v. Auld*, 5 Cranch, 262 ; *Richmond v. Gray*, 3 Allen, 25.

III. But the contract obtained by respondents of Elliott was not authorized by appellant's letter. That letter authorized an *actual sale*, not an option. The contract made with Elliott contained this provision : "If this contract is not carried out by said Glass and Austin according to the true intent and meaning thereof, then the amount paid by said Glass and Austin shall be *forfeited and this contract to be at an end.* If said Rowe fails to carry out this contract on his part, then he shall refund the said $200. But, if it is possible for said Rowe to make title good, it must be done."

"To entitle a party to a specific performance there must not only be a valid and binding agreement but as a rule the contract, at the time it was entered into, must have been capable of being enforced by either of the parties against the other. In other words there must be mutuality both as to the obligation and the remedy." Waterman on Specific Performance, sec. 196. Tested by this rule, this contract would not justify a court of equity to enforce its specific performance. It gives Glass and Austin an option for thirty days, *and a reasonable time thereafter*, for $200. If, at the end of thirty days, they decline to take the property, their liability is fixed at $200. On the other hand, if the property appreciates, as it did, they have bound Rowe to make the title good, if possible. He was to spare no costs or expense.

Respondents contend that this is not the effect of the contract, but it seems to us this is a fair construction. *Ramsey v. West*, 31 Mo. App. 676 ; *Bradford v. Limpus*, 10 Iowa, 35. If we are right that, upon the election of respondents, they could have terminated this contract and liquidated their default by forfeiting the $200 by them paid to Elliott, then it follows there was no *mutuality* in the supposed contract, and a court of equity is not called upon to lend its aid in enforcing

such a contract, at the instance of respondents, when it would have been powerless to have compelled them to take the land, had appellant been the plaintiff in this cause. *Marble Co. v. Ripley*, 10 Wall. 339.

Holding then, as we have, that time was the essence of the proposition of appellant to sell his lot, and that Elliott did not sell it within that time, and that the contract he attempted to make was in excess of his authority, we do not deem it necessary to decide the other questions raised in argument. For the reasons given it follows the decree of the circuit court must be reversed and the cause remanded to the circuit court with directions to enter a decree dismissing respondents' bill and entering a decree removing the cloud on appellant's title, caused by the recording of the alleged contract between Elliott as agent for appellant, and the respondents, Glass and Austin, and adjudging the costs against respondents. All the judges of this division concur.