# THE HAWAIIAN AGRICULTURAL COMPANY *v.* SAMUEL NORRIS.

### APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

### SUBMITTED OCTOBER 11, 1899.  DECIDED NOVEMBER 20, 1899.

### FREAR AND WHITING, J.J., AND CIRCUIT JUDGE STANLEY, IN PLACE OF JUDD, C.J., DISQUALIFIED.

An authority to sell is held to be an authority to make a binding contract to convey and not merely an authority to find a purchaser, under the circumstances of this case.

An authority to sell authorizes a sale for cash only, unless it is usual or customary to sell on credit where the sale is to take place.

The evidence in this case is held insufficient to justify a finding that it is usual or customary here to sell partly on credit in large land transactions.

A note to run several months is held not the equivalent of cash, even though the banks would receive it endorsed without recourse.

Where an agent makes a contract which is unauthorized in one particular, the mere fact that the principal, in repudiating it, gives as his reason that it is unauthorized in another particular, in which however, it is authorized, does not constitute a ratification, where the third party is in no way injured by the form of the principal's objection, so as to raise an estoppel.

Such subsequent act of the principal may be considered as evidence tending to show what authority he intended to grant originally, but in this case his subsequent objection to the purchaser alone and failure to object because credit was given is held insufficient to show that he intended originally to authorize a sale upon credit.

Specific performance is denied on the ground that the agent exceeded his authority in contracting for a sale partly on credit.

### OPINION OF THE COURT BY FREAR, J.

This is a bill in equity to compel the specific performance of a written contract dated June 8, 1898, whereby, it is claimed, the

defendant by his agent, Mr. J. O. Carter, agreed to sell and the plaintiff agreed to buy the property known as Kahuku Ranch, situated on the island of Hawaii, for $100,000, namely, $1,000 paid upon the signing of the contract, the balance to be paid upon delivery of the deed as follows: $19,000 cash and plaintiff's note for $80,000 endorsed by C. Brewer & Co., a corporation, payable September 1, 1898, with interest at six per cent., the deed to be delivered within thirty days. The Circuit Judge from whom the case comes on appeal denied specific performance and dismissed the bill.

Two defenses are relied on: (1) that the relation of principal and agent did not exist between Norris and Carter and that Carter had no authority as agent to enter into a binding contract for Norris, the theory of the defense being that the relation between Norris and Carter was that of principal and broker and that therefore Carter's authority was merely to find a purchaser and to bring him and Norris together, and (2) that even if Carter had authority as an agent to enter into a contract to sell binding on Norris, still he could agree to sell for cash only and therefore he exceeded his authority in agreeing to sell partly upon credit.

The facts are as follows:

Carter, as he testifies, was doing business in Honolulu as an agent and trustee. He had some years before been instrumental in the sale of this ranch to Norris from its previous owner. In the latter part of 1897 Norris met him and said that he wanted to sell the ranch and that his price was $50,000. Carter told him that a sale of that sort would better be advertised in the San Francisco papers. The matter was then dropped. Carter afterwards went to the United States. During his absence several applications were made to Norris for the purchase of the ranch, but he appears to have told the applicants that he would not sell until Carter returned. After Carter's return, Norris wrote to him as follows:

"Kahuku, May 11, 1898. J .O. Carter, Esq., Dear sir: I wish to sell Kahuku. I ast $100,000 dollars it. I have spent a large

amount of mony on it. I leave every thing but my carpet sack. Respectfully Yours,                                                        S. NORRIS."

Enclosed with this letter was an offer from one Jones for the purchase of the ranch.

Carter replied as follows:

"Honolulu, H. I., May 16th, 1898.   Col. Sam'l. Norris, Kahuku, Kau, Hawaii.   Dear Colonel:   Your letter of the 11th inst. enclosing A. K. Jones' offer to purchase the Kahuku Ranch property came duly to hand. I notice your terms to be $100,000 for everything on the ranch saving only your carpet sack. The would-be purchaser has not called upon me, but I will be on the lookout for him or any other man who desires the property. Thanking you for your confidence, I remain, very truly yours,
                                                        J. O. CARTER."

On the 18th or 19th of May, 1898, one Andrade called on Norris at the ranch and asked for an option to purchase, but Norris refused it and told him that he wanted $100,000, and that he would refer to Carter about him, and told him to see Carter about the price and all matters, and gave him the impression, as he testifies, that if he could pay Carter the price it would be satisfactory.

Norris then wrote to Carter:

"Kahuku, May 18, '98.   J. O. Carter, Esq.   Dear sir:   Your letter of 16th, inst. is at hand.   A man by the name of Andrade is here to look at the Rancho.   I referred to You.   He will Call to see You when he get back to Honolulu.   A fue months ago a man from Honolulu came here buy the place without looking at the place; his name is *Sorenson Austin* the Ass. from Hilo and *Monsarrat* has also bin here and wanted to buy the place—I told them I would not sell till you returned from the States.
                        Respectfully Yours,                        ·S. NORRIS.

P. S.   I did not write to Jones.   He has of corse nothing buy with.   The man Andrade is Portugese and represent that Colony."

Carter replied:

"Honolulu, H. I., May 26th, 1898.   Col. Sam'l. Norris, Kahuku, Kau, Hawaii.   Dear sir:   Your letter of the 19th inst.

duly to hand. Mr. Andrade has called upon me and asked for an option to purchase your ranch, but I said to him that I wished to be open to sell to other applicants and therefore must decline an option; that I would give him an even chance with any other intending purchaser. Mr. Jones has talked with me, but does not seem to mean business. You may count upon my doing the needful when a business proposition comes to me.

Very truly yours,        J. O. CARTER."

Norris replied:

"Kahuku, May 31st, 1898. J. O. Carter, Esq. Dear sir: Your favor of the 26th inst. is at hand. I got a note from Andrade saing he would be able to say wat he could by the next mail; He ware much pleased with the Ranch. If the Portuguise want land there is enough for all of them at Kahuku. Jones has nothing to buy with, and can do nothing with it if he had it.

Respectfully Yours,        S. NORRIS.

P. S. Here is miles of the finest Coffee land in Country."

Norris then received the following letter:

"Kapapala Ranch, June 1st, 1898. Col. S. Norris, Kahuku Ranch, Kau, Hawaii. Dear sir: Understanding that you have again offered Kahuku Ranch at private sale, I hereby make you an offer of One Hunderd Thousand ($100,000) Dollars *cash*, for all your right, title and interest in the district of Kau. Hoping to hear from you at your earliest convenience, I remain,

Yours respectfully,        J. MONSARRAT."

And replied as follows:

"Kahuku, June 2, 98. Mr. J. Monsarrat. Dear sir: Your favor of June 1st is at hand. I can give no aswer to your offer. J. O. Carter has the selling of the Ranch. The Portugues of Honolulu was trying to get money when lest heard from Carter. He send a men here last week to look at the place; He was somewh pleased with it—that toll me he wold buy himsef his Company did not take it.        Respectfully Yours,

S. NORRIS."

On June 7, 1898, Mr. G. H. Robertson of C. Brewer & Co., who were agents for the plaintiff, called on Carter and asked him if he were authorized to sell Kahuku Ranch. Carter replied that he thought he was and showed him the first letter from Norris.

Robertson said that he was satisfied with the authority and after some talk offered $20,000 cash, and $20,000 each year for four years in notes secured by the property. He then left. The next day, Carter wrote to him as follows:

"Honolulu, H. I., June 8th, 1898. Mr. George H. Robertson, of C. Brewer & Co'y Ltd., City. My dear Mr. Robertson: Since our conversation of yesterday, *re* the purchase of Kahuku Ranch property, I have given more thought to the matter and propose to modify the conditions of sale so far as to say that any terms other than cash shall be forwarded to Colonel Norris for his approval.        I remain, very truly yours,

J. O. CARTER."

Robertson then offered $20,000 cash and the balance in a note of the plaintiff endorsed by C. Brewer & Co., payable September 1, 1898, with interest at six per cent. Carter testified that in order to make himself thoroughly safe as to the terms and not knowing what to do with the money, he went to Mr. W. G. Irwin of Spreckels & Co.'s bank and asked him if he would take a note of the kind in question and he (Irwin) replied that he would. Carter also testified that he considered the note as good as cash and that in taking it he was acting in Norris' interest. Mr. Irwin testified that Carter came to him about the time of the sale and informed him of the terms and asked if the note was as good as cash and that he (Irwin) said that it was. Carter accepted Robertson's second offer and the agreement now sued on was then drawn up and signed and $1,000 paid on account.

The following correspondence then took place between Carter and Norris:

"Honolulu, H. I., June 8th, 1898. Col. Sam'l. Norris, Kahuku, Kau, Hawaii. Dear sir: Enclosed herewith you will please find agreement by me as your agent to sell the Kahuku Ranch and by the Hawaiian Agricultural Company to purchase said ranch for the sum of one hundred thousand dollars. The agreement explains the terms of sale. You should come to this city as soon as you can to execute the deed and receive the consideration. Bring or send all the papers you have to help the making of the deed. If you can make an inventory of the property to be conveyed please do so and have it ready on your arrival

here. Trusting that my action will meet your approval, I remain, very truly yours, J. O. Carter."

"Kahuku, June 21st, 1898. J. O. Carter, Esq. My Deer Sir: Your letter of the 8 inst. is at hand. I am surprised of Your agreement withe the Company. I will not sell Kahuku and less the Purtugees Colony want to settle it up. I have not received ther answer yet; they axt for time, J. Monseorrat offered me some time ago 100,000 dollars in Cash—whch I refused.

Your Respectfully, S. Norris."

"Honolulu, H. I., June 27th, 1898. Col. Sam'l. Norris, Kahuku, Kau, Hawaii. Dear sir: Your letter of the 21st instant was duly received and I note your surprise that I had agreed to sell your ranch to C. Brewer & Company for the sum you fixed. I think if you will read over the copies of your letters to me and my replies that you will see that you did not express any objection to any purchaser. You did say that Mr. Andrade had looked over the estate and expressed satisfaction with what he had seen. Mr. Andrade came to me for an option and I refused it. He said to me that he hoped to secure the loan to make the purchase from Mr. James Campbell. I called upon Mr. Campbell and he said that Mr. Andrade had applied for the money and that he had declined to make the loan. When C. Brewer & Company offered your price I felt bound to accept it. The terms are equal to cash, for the proposed notes can be cashed at once if you require the money. The sale is a good one. Mr. Irwin told me that he would not give fifty thousand for the property. The proposed notes bear interest of over thirteen dollars a day and the sooner you make the deed the better.

"The agreement to sell has been placed of record and I am given to understand that the C. B. & Co. will bring a suit to compel you to give a deed, and I am bound to say to you that in my opinion the company has a good case. It would have been better had you come to Honolulu so that we could have talked the matter over. If you wished to sell the ranch and obtained your price what matters it to you who buys? Let me advise you not to make sales of any of the property on the ranch until the question of sale to C. B. & Co. has been definitely settled, as all such sales will only make complications.

"I regret that any misunderstanding has arisen, but I am quite

sure that my action has been a reasonable one. By all means come on the return of the bearer of this and let us talk the matter over. Very truly yours,

J. O. CARTER."

"Honolulu, H. I., July 7th, 1898. Col. Sam'l. Norris, Kahuku, Kau, Hawaii. Dear sir: I wrote to you on the 27th June and failing to receive a reply to my letter fear that it miscarried. The letter urged your coming to this city to confer with me regarding the sale of Kahuku. I also advised you to complete the sale by executing a deed at an early date. Since writing that letter I have given the matter more thought and feel convinced that the price you set upon it and which I obtained is a fair one. In fact I do not know of any person or persons who would be likely to pay cash at the figure secured. The Hawaiian Agricultural Company or the Hutchinson Sugar Co. were to my mind the possible purchasers. Mr. Irwin has assured me since the sale that Hutchinson Estate would not have bought at any such figure. I am of the opinion that the H. A. Co. people will go to law to secure deed and they have a fighting chance.

Very truly yours, J. O. CARTER."

"Honolulu, H. I., July 8th, 1898. Col. Sam'l. Norris, Kahuku, Kau, Hawaii. Dear sir: This morning the directors of the Haw. Ag. Company called upon me to take passage on the bearer of this to call upon you and secure your signature to a deed already prepared. I have reason to believe that this was done under advice of lawyers. I can see no possible reason why you should not come to Honolulu and therefore strongly urge you to do so. I think that if you were here and could advise with me and other of your friends you would conclude to effect the sale. Very truly yours, J. O. CARTER.

P. S. Just now a tender of the money and demand for deed has been made upon me and legal proceedings will be taken which you should be here to contest."

"Kahuku, July 12, 1898. J. O. Carter, Esq. My Deer Sir: Your favor of the 7 is at hand. In reply I can only say I will not sell Kahuku at all, and les the Portuguise want it. I am not able to come to Honolulu. Respectfully Yours,

S. NORRIS."

Mr. P. C. Jones, of the Bank of Hawaii, testified that the note would be accepted by any bank as the equivalent of cash and that it would not require Norris' liability added, and that it was

better to take the note alone, considering the name back of it, than to take a mortgage, as there would be a saving of expense. Mr. Irwin of Spreckels & Co.'s bank also testified that Norris could endorse the note without recourse and that his name would cut no part, though as a rule endorsements without recourse were not taken at the bank.

Norris testified that he did not authorize Carter to sell the ranch for him, that he wanted some one to inform him what was going on here, that he was astonished when he learned of the sale and wrote to Carter that he had no right to sell, that he would like to have directed him as to cash or credit, that the note was not as good as cash but would be dead when it became due, that he wrote to Carter as a friend to inform him, that he named the price in order to find out who wanted the land, that he wrote to Monsarrat as he did in order to get rid of him because he bothered him about the land by coming to Kahuku and wanting to buy and by writing about it, and that he refused Monsarrat because he was waiting for annexation and was negotiating with a party in the United States, that in the event of annexation he might not want to sell at all, that he wrote Monsarrat that Carter had the selling of the land because that was just what came into his mind, that it was not true that Carter had the selling of the ranch, that he referred Jones, Andrade and Monsarrat to Carter, and that he did not remember whether he had said that he would not sell to a d—— missionary corporation, but that he might have said so and that if he did it was a fact.

The plaintiff duly tendered the cash and note and an ordinary deed, without covenants, to be executed and, upon the rejection of these, brought this suit, offering to perform its part of the agreement or, at the option of Norris, to pay cash instead of giving a note.

The first question is, was Carter authorized to make a binding contract to sell, aside from the question of cash or credit? Or was he employed merely to find a person who was willing to purchase and then bring him and Norris together to make a contract or not as they might or might not agree? The question is,

what was the intention, what was meant by Norris' first letter, considering all the circumstances? No two cases are alike and no hard and fast rule can be laid down applicable to all cases of this general nature. Norris' first letter, in the absence of any controlling circumstances, might be taken as merely an offer to sell to Carter upon the terms stated. He wrote to Carter "I wish to sell Kahuku." But when we consider his previous conversation and subsequent correspondence with Carter and the nature of Carter's business, it is clear that the letter was intended, not as an offer to sell to Carter but as an authority to Carter to negotiate a sale to some one else. But did Norris mean, "I wish" you to contract "to sell Kahuku" or "I wish" you to find a person who is willing to buy and then inform me so that I can contract "to sell Kahuku" or not as I please? What does the word "sell" import in itself in cases of this kind and how is its meaning controlled in the present case by the circumstances? Some courts hold that an authority to sell carries with it the power to contract—on the ground that the latter power is necessary to make the former effective. Other courts hold that an authority to sell is merely an authority to find a purchaser,—on the theory that this is ordinarily all that is done by real estate agents or brokers and that therefore this is all that is expected by one who places property in their hands for sale, and because there may be particulars which the owner may wish to decide for himself, and because powers of this kind should be construed strictly for the reason that they may be created by parole and informally and it would open the way for fraud and abuse to construe them liberally, and, in reply to the argument that a power to make a contract is implied as necessary to make effective a power to sell, it is said that if any power to execute a document is necessary to make effective a power to sell it would be a power to execute a deed and not merely a contract to convey and yet it is everywhere agreed that an agent or broker cannot execute a deed under an authority of the kind now in question.

Defendant's counsel relies principally on New York, New Jersey, California, Indiana, and Washington State cases in support of the latter theory.

The New York case chiefly relied on is that of *Glentworth v. Luther*, 21 Barb. 145. That was not a case for specific performance, nor did the agent sign the contract. The principal himself signed it. That was an action for commissions, and the court held that a broker was entitled to commissions when a contract for a sale was made whether afterwards carried out or not. But the same court the year before in a suit for specific performance of a contract signed by the broker, *Coleman v. Carrigucs*, 18 Barb. 60, held that the broker had an authority only to find a purchaser. But in a later case, *Pringle v. Spaulding*, 53 Barb. 17, these and other New York cases were reviewed and overruled in so far as they held that an authority to sell did not authorize the agent to sign a contract. The court said that that proposition could "not be sustained consistently    *    *    *
with the principle which is frequently asserted as being elementary in the law of agency, namely, that an authority to do an act, includes an authority to employ whatever means are necessary to accomplish a due execution of the power." See also *Haydock v. Stow*, 40 N. Y. 363, 368. *Sibbald v. Bethlehem Iron Co.*, 83 N. Y. 378, like *Glentworth v. Luther, supra*, was an action for broker's commissions and contained nothing inconsistent with the views expressed in *Pringle v. Spaulding, supra*.

The earliest of the New Jersey cases cited is that of *Morris v. Ruddy*, 20 N. J. Eq. 236. This was decided mainly on the authority of the earlier New York cases which were afterwards overruled and therefore its weight is somewhat lessened. In the next case cited, *Milne v. Kleb*, 44 N. J. Eq. 378, the court relied on the earlier case for authority, but also pointed out other sufficient grounds to show that the agent did not have authority to sign in that particular case. But the later cases of *Lindley v. Keim*, 54 N. J. Eq. 418 and *Scull v. Brinton*, 55 N. J. Eq. 489, overruling the elaborate decisions of the Vice Chancellors reported in 30 Atl. Rep. 1063 and 55 N. J. Eq. 747, are much stronger cases for the defendant. Still, there was no authority in writing and the court, proceeding on the theory that the cases were merely those of the employment of an ordinary real estate

broker, held that while circumstances might show that an authority to sign a contract was intended yet the circumstances were not sufficient to show that in those cases. The position taken seems to have been that while an authority "to sell" may mean either an authority to make a contract to sell or only an authority to find a purchaser, the presumption is strongly in favor of the latter meaning. See also *Tyrrell v. O'Connor*, 56 N. J. Eq. 448.

The California case cited is *Grant v. Ede*, 85 Cal. 418. There the principal wrote "we will sell." There were no controlling circumstances. The court held that there was only authority to find a purchaser. Earlier California cases were cited to show that this was all that an authority to sell amounted to in the case of an ordinary employment of a broker.

The Indiana case is *Campbell v. Galloway*, 148 Ind. 440. A broker wrote asking if a certain lease was for sale and what there was in it for him. A reply was sent by a third party who signed for the owner without authority as follows: "I paid $200.00 for the lease and will not sell it for less than $250.00 net to me. All over that sum you can have." The court held that the owner had not given any authority at all, but added that if he had authorized the reply it would have conferred only authority to find a purchaser. The California cases were cited. There were no controlling circumstances.

The Washington State case is *Carstens v. McReavy*, 1 Wash. St. 359. This is a strong clean cut decision in support of the view that an authority to sell amounts only to an authority to find a purchaser. See *Service v. Deming Inv. Co.*, 56 Pac. (Wash. St.) 837.

The case of *Hamer v. Sharp*, L. R. 19 Eq. 108, also was relied on by counsel. It was cited partly to show that no power to contract was intended because there would remain the question of title deeds to be settled. This reasoning so far as title deeds are concerned has not the same force here that it has in England. See *Lindley v. Keim*, 30 Atl. R. 1063 and *Ludwig v. Schultze*, 4 N. Z. 247.

See also *Bosseau v. O'Brien*, 3 Fed. Cas. 914.

Now, the cases *contra*.

The later New York cases have already been referred to.

In Missouri the same view prevails. In *Smith v. Allen*, 86 Mo. 178, specific performance was granted where the principal wrote to the agent: "I will leave the sale of the lots pretty much with you; if the party, or any one, is willing to pay," &c., stating the terms, "I think I am willing to have you make out a deed and I will perfect it.   *   *   *   If you think I better try spring market, hold till then   *   *   *." See also *Stewart v. Wood*, 63 Mo. 252, 256. In *Glass v. Rowe*, 103 Mo. 513, in reply to a telegram from the agent, the principal wrote: "Will now sell at $350 per foot." Counsel argued that there was authority only to find a purchaser, citing the California and New Jersey cases. But the court held that there was authority to sign a contract, though it refused specific performance on other grounds.

In *Johnson v. Dodge*, 17 Ill. 433, the lower court refused specific performance, but the Supreme Court reversed the decision. See also *Harding v. Parshall*, 56 Ill. 219.

In *Jackson v. Badger*, 35 Minn. 52, the principal wrote: "You may sell for $5000," &c. The court decided the case on another ground, but said that the letter authorized the agents to make a contract.

In *Hopwood v. Corbin*, 63 Ia. 218, the principal inclosed a list of his lands and prices and wrote: "If you can effect any sales I shall be glad of it, but I shall not put them into your hands to sell absolutely. I reserve the right to sell through anybody making such offers to me as are satisfactory, or to refuse any offers that may be made; but you can rely upon it, if you work up purchasers at the prices herein named before anybody else buys the land, that your party will get it and that you will make your commission." The Supreme Court, overruling the lower court, granted specific performance of the contract signed by the agent.

In *Lyon v. Pollock*, 99 U. S. 668, the principal wrote: "I wish you to manage (my property) as you would with your own. If a good opportunity offers to sell everything I have, I would be glad to sell." These words were construed, in the light of the

circumstances under which they were written, to confer authority to contract, and specific performance was granted.

Thus, the authorities are pretty well divided. Without undertaking to decide now whether a bare authority to sell implies an authority to contract, we may at least gather from the cases as well as from ordinary usage that an authority to sell may very naturally in any particular case be intended to carry with it a power to contract and that such intention may be shown by slight circumstances.

Besides the principle that the grant of a power includes all incidental powers necessary to make it effective, there is another principle that is often invoked in deciding questions of this kind. It is that in a case of ambiguity, uncertainty or doubt, a grant of power should be construed more strongly against the grantor who is to blame for the ambiguity than against an agent or one with whom he has contracted when these have entered into a contract in good faith in reliance upon a construction of which the power is reasonably capable even though not the one in fact intended by the grantor. See *Hopwood v. Corbin, supra; Very v. Levy,* 13 How. 345; *Winne v. Niagara Fire Ins. Co.,* 91 N. Y. 185; Story on Agency, Sec. 74; Benj. on Sales, Sec. 590.

Now in the light of what has been said, let us look at the circumstances of this case. It is obvious that the agent, Mr. Carter, was led to believe that he had authority to contract and that he acted in good faith on this construction and that at least he had much ground upon which to base such a construction. There is much reason to believe that Col. Norris himself intended such construction. It is true, he wrote: "I wish to sell." But, as we have seen, this was not intended as an offer to sell to Carter or as an expression of a wish merely to do something himself. It was intended as an authority or a request to Carter to do something. If the words were expressly, "I wish you to sell," perhaps this would be sufficient to show without going further that Carter had authority to contract, and it may be that the use merely of the words, "I wish to sell," if this were all, would at least leave the question in doubt or even tend to show that Carter

was merely to find a purchaser. But this was not all. Norris stated definitely the terms on which he was willing to sell, so that here was nothing left to consult him about before concluding a contract, unless it were the person or character of the purchaser. But he never intimated to Carter that he had any preferences in that matter nor was there any reason to suppose that he had, for he was to sell his entire property and the question of "neighbors" would not be involved as it might be if he were selling in lots. He himself referred at least three different persons to Carter. Carter wrote to him in regard to one of these, Jones: "the would be purchaser has not called upon me, but I will be on the lookout for him *or any other man* who desires the property." Norris made no objection to this. Norris would not contract with others himself when he had the opportunity. He gave one, Andrade, the impression that Carter had authority to conclude a contract with him. He wrote to another, Monsarrat, who offered his full price in cash, "I can give no answer to your offer. *J. O. Carter has the selling of the ranch.*" He told two persons, Austin and Monsarrat that he would not sell until Carter returned from the States. Carter wrote Norris that Andrade had asked for an option to purchase the ranch but that he had refused it. This elicited no reply from Norris to the effect that Carter had no power or contract for an option, though that would be to go further than to contract for a sale. Carter wrote in the same letter that Jones had talked with him but that he did not seem to mean business, but that, "You may count upon my *doing the needful when a business proposition comes to me.*" Norris acquiesced. And when Carter wrote to Norris that he had entered into a contract for the sale of the ranch, Norris did not question his authority to make a contract but objected, in so far as he pointed out specific objections, merely to the purchaser and then for the first time expressed a preference in that particular, and made statements in his letters and afterwards on the witness stand contradictory to his previous statements and acts. It must be remembered also that Norris lived in a remote district between which and Honolulu communication was infrequent and this adds strength to the theory that Norris intended that Carter

should make a binding contract when he found an opportunity to do so. In view of all these circumstances we must hold, with the Circuit Judge, that Norris cannot now set up that Carter had no authority to make a binding contract for the sale of the property.

The question now remains whether he had authority to contract partly for credit. It seems to be pretty well settled, and on good grounds, that an authority to sell real estate, in the absence of any indication to the contrary, authorizes a sale for cash only, unless it is usual or customary to sell on credit in the place where the sale is to take place.

An attempt was made in this case to show that in large transactions of this kind it is usual and customary here for agents to sell partly on credit. But, as held by the Circuit Judge, the attempt was unsuccessful. One witness said that if he as an agent had general authority to sell land he would feel authorized to accept terms like those offered in this case, but this was merely the expression of his personal opinion as to how he would feel and not as to what was customary and he added that he would feel the same way if he were expressly instructed to sell for cash. He also said that the customary method was "part cash and part note *with security.*" The other witness who is relied on said that in a large transaction of this kind paper is given, but he did not say that it was customary for agents to accept paper, and added in the same sentence that he was led by Mr. Carter to understand that it was a legitimate transaction. Large transactions of this kind have not been frequent here. No doubt special terms of sale have been arranged in each case. It certainly has not been shown to be usual or customary to accept paper in transactions of this kind in such a way that Norris must be presumed to have known that such is the usual or customary course. Indeed, this is the case of a special agency created for the sale of a particular piece of land. In such cases it is usually held that the person who deals with the agent is bound to ascertain the extent of the agent's authority and it is at least questionable whether a case of this kind would admit of proof of a general

custom. See, for instance, *Riley v. Wheeler*, 44 Vt. 189; *Dyer v. Duffy*, 39 W. Va. 148, 19 S. E. 540.

An attempt was made also to show that the transaction was substantially a cash transaction, by showing that the note was considered as good as money or even better because it drew interest. A check might under some circumstances be deemed cash, as perhaps if it were given and received not as payment in itself but merely for convenience and as a means of transferring the cash without actually handling it, but that would be very different from what was done in this case. Here a note was to be taken to run several months. Carter was authorized to sell, not to invest or to exchange. If he did what he considered for the best interests of his principal, but what was unauthorized, he and the one with whom he dealt took the risk of having his action ratified or not as his principal saw fit. The court cannot make a contract for the principal on the ground that it would be for his best interests. It might under some circumstances hold him to a contract that contained all that he authorized even though it contained an additional provision for his benefit, but it could not hold him to a contract which contained what he did not authorize in place of what he did authorize. In this case he authorized a sale for $100,000. He might be held to a sale for $200,000, but not to a sale or barter for a quantity of merchandise worth $200,000. Carter undoubtedly thought that the note was as good as cash and no doubt it was, but it was not cash, and if the contract had been for cash it could hardly be contended that Norris would be obliged to accept the note on the ground that it was as good as cash or better than cash for him. The question is not whether the note was as good as cash or whether the agent thought it as good as cash but whether the principal was willing to take it in place of cash. And although the plaintiff now offers cash in place of the note at Norris' option yet that is not in pursuance of the contract that was made and the court cannot alter the terms of the contract for the parties.

It was further contended for the plaintiff that the defendant, by expressly objecting to the sale on another ground and making

no objection on the ground that it was in part for credit, recognized and acquiesced in the provision for credit and so, by a species of ratification must be deemed to have authorized it. Norris, when informed by Carter of the sale and its terms, replied that he would not sell at all unless to the Portuguese, and said nothing about cash or credit. Does this show that he meant to object only to the purchaser and that he either ratified or previously intended to authorize the contract as to the matter of credit?

If he had accepted a benefit under the contract, as, for instance, if he had accepted the $1000 paid to Carter with full knowledge of the terms of the contract, he would be held to have ratified the entire contract even though he may have at the same time expressly repudiated the provision as to credit. For, he would be obliged to adopt or repudiate the contract as a whole. But he did not accept any benefit under the contract.

If the sale had been for cash in gold and a tender had been made to him of cash in silver or of paper currency or of a bank check and he had refused to carry out the contract solely on the ground that Carter had no authority to make it, he would be estopped from afterwards setting up that the tender was not made in gold, for, if he had made that objection at the time, the vendee might have brought the gold before it was too late. By not objecting at the time he would have misled the vendee to believe that there was no objection to the character of the tender and so he would not be allowed to take advantage of such result of his own action afterwards. But if the tender were made too late in the first place, his objection solely on the ground of the agent's want of authority to make the contract would not estop him from setting up afterwards that the tender was not properly made, for the vendee would be no worse than he would be if an objection had been made to the character of the tender. In this case the plaintiff was not misled to its detriment by the form of Norris' objections. It could not have avoided the effect of the objection on the ground of credit, if it had been made.

Here Norris repudiated the entire contract but stated only

one ground of objection and the question is whether upon that objection being found untenable he can set up other objections which would otherwise have been tenable. This question is answered clearly in the negative by the Supreme Judicial Court of Massachusetts in a case decided this year, *Brown v. Henry,* 52 N. E. 1073, the head note of which reads as follows: "Where an agent makes a contract which is unauthorized in several particulars, the mere fact that the principal, in repudiating it, gives . as his reason that it is unauthorized in a certain particular, in which, however, it is authorized, does not constitute a ratification, where the third party is in no way injured by the form of the principal's objection, so-as to raise an estoppel."

Accordingly, counsel for the plaintiff, upon a second argument heard upon this point, relied upon Norris' failure to object to the provision for credit, not as proof of a technical ratification or estoppel, but as an evidential fact from which in connection with all his previous letters and all other circumstances, it might be inferred that he meant originally to give authority to Carter to sell on credit. In support of this view the following cases are cited: *Harding v. Parshall,* 56 Ill. 219, 226; *Bartlett v. Sparkman,* 95 Mo. 136, 139; *Le Roy v. Beard,* 8 Haw. 451, 469; *Mann v. Laws,* 117 Mass. 293, 297; *Johnson v. Jones,* 4 Barb. 369, 373. No doubt it is a sound rule that the acts of a principal after he has acquired full knowledge of the terms of a contract entered into by his agent may be considered as evidence tending to show what authority he intended to grant originally, but, as seems to be conceded by counsel for the plaintiff, the cases cited do not throw much light upon this rule in its application to this case.

In our opinion it cannot fairly be inferred that Norris intended to confer on Carter authority to give credit. Norris' first letter by itself could not be construed as conferring authority to enter into a binding contract at all. It is only in the light of the subsequent letters and all the circumstances that that construction can be put upon the first letter. To go further and hold that there was authority to contract for a sale on credit would in our

opinion be going too far. Norris' intention evidently was to utterly repudiate the whole contract. He did not undertake to analyze it or review it critically or state all his objections to it. His correspondence as a whole shows he was not one who would be likely to do that. There was no intention to acquiesce in any of the provisions of the contract or to recognize any of them as authorized. His letter of June 21, taken as a whole and by itself would seem to indicate that he had not intended that Carter should make a contract at all quite as much as that he had intended that credit might be given. For, while he says he will not sell at all unless to the Portuguese, he also says that he is surprised at Carter's agreement with the company and that he himself had refused an offer of $100,000 cash from J. Monsarrat. This letter cannot be taken as throwing much light on what Norris originally intended. We could not very well hold that he intended originally that credit might be given unless that is pretty clearly shown by the previous correspondence. But it is hardly contended that that is shown by the previous correspondence. It is true that Carter wrote in his letter of May 26 that Norris might count upon his doing the needful when a business proposition came to him, but the inference from this, especially in connection with the remainder of the letter, is that Carter meant that he would make a contract to sell, not that he would make a contract to sell on credit. Carter wrote also in the same letter that he had refused to grant an option to purchase, but Norris would be justified in inferring that this meant merely an option to purchase for cash and not an option to purchase on credit, and as matter of fact Carter himself then had cash in mind as shown by his letter of June 27. No doubt, as argued, Norris had great confidence in Carter but he did not intend to give him unlimited authority to do whatever he thought best for Norris' interests. It may be that Norris is relying on the provision for credit, without any real objection to that, but merely because he can rely on it, in order to avoid a contract which he objects to on other grounds which are untenable and that in good conscience he ought to carry out the contract, but the court cannot force him to do what he has not bound himself to do whatever his

reasons may be.  And while, as already stated, a principal ought
to be held to a contract made in good faith by his agent upon a
certain construction of an authority when such authority is fairly
and reasonably capable of such construction, yet on the other
hand the agent and the one with whom he deals ought not to be
allowed too readily to stretch an authority so as to deprive the
principal of his rights through a course of procedure which he
never contemplated.  If there is a serious doubt as to the power
of the agent he should get more explicit instructions if possible
or else he must take his chances as to his acts being ratified by
his principal.  In the present case, Robertson, who dealt with
Carter, had no ground for supposing that a sale on credit was
authorized.  He was shown Norris' first letter only, as Carter's
sole authority, and that of itself could not possibly be construed
as authorizing a sale on credit, and further when he offered notes
extending over a period of four years Carter wrote to him that
any terms other than cash should be forwarded to Norris for
approval.  And Carter himself did not have sufficient ground for
believing that Norris intended to authorize him to sell on credit.
As we have seen, there was nothing in any of the letters to justify
such an inference, and as shown by his letter to Robertson he
seemed to think so himself after giving, as he wrote, more
thought to the matter.  Carter did not accept Mr. Robertson's
offer of the note on the ground that it was the same as cash.  This
is clearly shown by his action and by his letters of June 27 and
July 7.  He accepted it on the ground that it was equal in value
to cash and he did not feel absolutely certain of even this until
he had consulted a banker.  He apparently acted either on the
belief that Norris would ratify his act or else on the supposition
that what he thought after consultation with others to be as good
as cash would be considered in law as the same as cash as against
Norris.  But Norris did not ratify the act nor is a note, however
good it may be shown to be, the same as cash in the eye of the
law as against one who has not bound himself to consider it so.
Carter and Robertson took their chances.  If the note would have
been received at the bank as cash, it would have been an easy mat-
ter for C. Brewer & Co. to have got the cash themselves and

contracted for cash and so to have saved all question. The proposition for credit came from them for their benefit, not from Carter for Norris' benefit, whether it would have been for his benefit in fact or not. He was judge as to that.

The decree appealed from dismissing the bill is affirmed.

*Kinney, Ballou & McClanahan* and *H. P. Weber* for plaintiff.

*F. M. Hatch* for the defendant.